## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

FEDERAL INSURANCE COMPANY,

        Plaintiff,

  v.

SPEEDBOAT RACING LTD.,

        Defendant/Third Party Plaintiff,

  v.

RAMBLER 100 LLC

        Third Party Defendant .

Civil Action No.
3:12-cv-1480 (CSH)

AUGUST 9,  2016

## OMNIBUS RULING ON PENDING MOTIONS

### HAIGHT, Senior District Judge:

"If the highest aim of a captain were to preserve his ship, he would keep it in port forever." This aphorism is attributed to St. Thomas Aquinas,[1] whose resume did not include ocean yacht racing.

The ship involved in this action, an ocean racing yacht, did not remain in port.  Rather, in August 2011, while participating in a race off the coast of Ireland, the yacht capsized in heavy seas and suffered severe damage.  This litigation is about who should pay for that damage.  The parties

---

[1] "*Nuggets of Wisdom of St. Thomas Aquinas*," http://primacyofreason.blogspot.com/2011/01/nuggets-of-wisdom-of-st-thomas-aquinas.html (published January 27, 2011) (site accessed Aug. 8, 2016); *see also* Thomas F. Jaras, *In the Trough*, at 209 (2013); http://www.quoteauthors.com/thomas-aquinas-quotes/ (accessed Aug. 8, 2016).

are yacht's insurer, her owner, and her operator at the time of the casualty.  The suit began as an action on a policy of marine insurance, within the admiralty and maritime jurisdiction of this Court. A number of motions are pending.  This Ruling resolves them all.

## I.     BACKGROUND

### A.     Factual History

The former plaintiff, Federal Insurance Company ("Federal" or "Plaintiff"), commenced the action against its insured, Speedboat Racing Ltd. ("Speedboat"), by filing a "Complaint in Admiralty" [Doc. 1] , alleging that Federal has no duty to pay Speedboat for damages that occurred to the mast, sails and spars of Speedboat's racing yacht known as Rambler 100 ( the "Yacht") on August 15, 2011.[2]  In its Complaint, Federal asserted that the Court possessed both "diversity of citizenship" subject matter jurisdiction under 28 U.S.C. § 1332 and admiralty jurisdiction pursuant to 28 U.S.C. § 1333.[3]  *See* Doc. 1, at 2 (¶¶ 4-5).

"Rambler 100," the Yacht referred to in Federal's complaint, was formerly named "Speedboat," and was owned by the corporate party also called Speedboat.  The Yacht was insured under a "Masterpiece Yacht insurance policy" issued by Federal (Policy No. 0037009323) (the

---

[2]  According to Speedboat, the Yacht is "a highly sophisticated racing sloop, 30 meters long" which was designed by Juan Kouyoumdjian of Juan Yacht Design and built by T.P. Cookson Boatbuilders Ltd." Doc. 20 (Speedboat's "Amended Third Party Complaint"), at 3 (¶ 8).  The Yacht includes in its design features "a canting keel approximately 14 feet long, weighing 30,360 pounds with a 18.7 foot bulb at the bottom." *Id.*  The keel is "managed by a drive unit and hydraulic release valves, which act as shock absorbers to reduce the shock loads on the keel under the conditions expected when the Yacht is racing in heavy ocean seas." *Id.*

[3]  The Court notes that it is well settled that marine insurance contracts are within the admiralty jurisdiction. *New England Mut. Marine Ins. Co. v. Dunham*, 78 U.S. (11 Wall.) 1, 4-6, 20 L.Ed. 90 (1870).  *See also  Fireman's Fund Ins. Co. v. Great Am. Ins. Co.*, 10 F. Supp. 3d 460, 475 (S.D.N.Y. 2014)*, appeal dismissed* (Mar. 1, 2016), *aff'd*, 822 F.3d 620 (2d Cir. 2016).

"Policy") to the corporate Speedboat, as assured, for up to $5,000,000 in damages to the Yacht.  *Id.*, at 2 (¶ 7).[4]  The policy term was October 14, 2010 through October 14, 2011.  *Id.*  The Yacht  was leased by Speedboat to a different entity, Rambler 100 LLC ("Rambler"), pursuant to a "Share Issuance and Shareholder Agreement" (the "Agreement") (dated October 14, 2010),  which provided,  *inter alia*,  that  Rambler would have exclusive use of the Yacht in the 2011 Atlantic Ocean Racing Series and would be responsible to pay "all operating expenses, repair and maintenance costs for the Yacht and its Equipment, including minor maintenance or major equipment failure, incurred during the Term and after  redelivery."[5]  *See* Doc. 10-3 (Exhibit C, "Lease Agreement, dated  October 14, 2010"),  at 5 (§ 4.1(a)).[6]

Pursuant to its terms, the Agreement was to be "governed by and construed in accordance with the laws of the State of Connecticut."  *Id.*, at 10 (§ 5.4).  The Agreement provided Rambler with an ownership interest in Speedboat ("one (1) redeemable share of a nominal par value of U.S. $1.00"), *id.*, at 2 (Preamble), and exclusive use of the Yacht from October 14, 2010 to March 15,

---

[4]  *See also* Doc. 1-1 (Ex. A), entitled "Masterpiece"  (Policy No. 0037009323).  The Court notes from the policy that Federal is a member of the "Chubb Group of Insurance companies doing business in the United States."  *Id.*, at 2.

[5]  Speedboat, Rambler, and an individual named Alexander E. Jackson, Speedboat's "Director,"  entered into the "Share Issuance and Shareholder Agreement" (the "Agreement") on October 14, 2010.  The Court notes that Speedboat refers to the Agreement throughout its pleadings as the "Lease Agreement," stating that it "provides for, among other things, Rambler's lease of the Yacht and other related assets of Speedboat."  *See, e.g.*, Doc. 10, at 2 (¶ 2) and at 3 (¶ 8); Doc. 20, at 2 (¶ 2) and at 3 (¶ 7).

[6]  The Court notes that the Agreement also appears as an Exhibit to other pleadings in this action, including Doc. 50-1.

3

2012, for the purpose of racing the Yacht in a series of sailing races, *id.*, at 4 (§ 4.1 (a)).[7]  Under the Agreement,  Speedboat's captain, Chris Higgins, and a member of its former crew, Bill Erkelens, were to be retained as members of Rambler's  crew.  *Id.,* at 5 (§ 4.1(b)).  In addition, Jackson and "one guest from a list provided by [Jackson] to Rambler" were to be allowed to accompany the vessel on all races  and  included as "uncompensated members of [Rambler's] crew at their request." *Id.*,  at 8  (§ 4.1(n)(1)).

On August 15, 2011, Rambler raced the Yacht in the 2011 Rolex FastNet Race off the coast of Ireland.  Doc. 20 (Speedboat's "Amended Third-Party Complaint"), at 5 (¶ 21).  But, as all sailors know, "[t]he sea hath no king but God alone."[8]  So it was that during the course of that race, "[f]acing 23-25 knot headwinds in heavy seas, the Yacht's canting keel snapped off just below the hull exit, whereupon the Yacht capsized, resulting in millions of dollars of damage to the Yacht."[9]  *Id.*  As a result, Speedboat claimed payment from Federal for damages to the Yacht's "sails, mast, spars and

---

[7]  The Agreement stated that Speedboat "intends to issue Rambler, one (1) redeemable share of a nominal or par value of U.S. $ 1.00 (the 'New Share') redeemable by [Speedboat]" upon the terms set forth in the Agreement.  Doc. 10-3, at 2 (Preamble).  In return, Rambler agreed to pay Speedboat One Dollar ($1.00) (the "Purchase Price") for the New Share. *Id.*, at 2 (§ 1.2).  Speedboat would thereafter "issue the New Share to Rambler as fully paid and non-assessable, make the necessary entries in [Speedboat's] Register of Members reflecting Rambler as the registered holder of the New Share and issue a share certificate representing the New Share in the name of Rambler." *Id.,* at 3 (§ 1.4(c)).  The Agreement further specified that Speedboat "is and will remain the record owner of the Yacht."  *Id.*, at 9 (§ 4.2(b)).

[8]  Dante Gabriel Rossetti, "The White Ship" (1881).

[9]  Rambler described the part of the Yacht that "broke off" during the 2011 Rolex Fastnet Race as the "keel fin."  Doc. 48, at 4.  From the pleadings, the parties do not appear to dispute the facts regarding the nature of the damage to the Yacht.

rigging in the amount of $3,130,000.00."[10]  Doc. 1, at 3 (¶ 15).

## B.   Procedural History

In its Complaint, Federal requested  declaratory judgment pursuant to 28 U.S.C. § 2201 that it has no duty to pay Speedboat for the damages at issue to the "spars and sails" of the Yacht which occurred on the occasion of the 2011 Rolex Fastnet Race.[11]  Federal asserted that those damages were explicitly excluded from coverage under the terms of the Policy. In particular, Federal quoted the exclusion provision in the Policy, as follows:

> "Spars and Sails." We do not cover any loss to spars running or standing rigging, sail, spinnakers or gennakers that occurs while your yacht is being raced.

Doc. 1, at 1 (¶ 1).

With respect to the damages claimed by Speedboat, Federal asserted that they occurred "[d]uring a race" when "the keel failed and the Yacht immediately heeled over," causing the mast and sails to break off and suffer damage.  *Id.*  Consequently, Federal sought "a declaratory judgment claiming that it has no duty to pay the damages for the mast and sails because they were damaged

---

[10]  Given the public setting of the race and the danger to the lives of the crew, the capsize was reported as a newsworthy event.  *See, e.g.*, http://gcaptain.com/rambler-capsizes-losing-keel/. "[O]n a motion to dismiss, a court may consider ... 'matters of which judicial notice may be taken.'" *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)(quoting *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993)).  News articles may be judicially noticed for the fact of their publication, as opposed to the truth of their contents.  *See, e.g.,  In re Merrill Lynch Tyco Research Sec. Litig.*, No. 03-CV-4080(MP), 2004 WL 305809, at *4 n.3 (S.D.N.Y. Feb. 18, 2004).

[11]  28 U.S.C. § 2201 provides, in pertinent part:

(a) In a case of actual controversy within its jurisdiction, . . .  any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

while the Yacht was being raced[,] which loss is excluded under the [P]olicy." *Id.*

Speedboat answered the Complaint [Doc. 8] and filed a Third-Party Complaint [Doc. 10] against Rambler, alleging that Rambler had breached the Agreement.  In its third-party complaint, Speedboat specified that "[t]his Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Speedboat and Rambler are citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs." Doc. 10, at 2 (¶ 6).  Speedboat also asserted that the Court "has jurisdiction of this action pursuant to 28 U.S.C. § 1367 because the claims asserted in this Third-Party Complaint are within the Court's supplemental jurisdiction, as the claims in this Third-Party Complaint are so related to the claims in the Complaint previously filed by the Plaintiff [Federal] that they form part of the same case of controversy."[12]   *Id.* at 3 (¶ 7).

---

[12]  With respect to diversity, in the Third Party Complaint [Doc. 10], Speedboat alleged that it is "an entity formed under the laws of the Cayman Islands with its registered office c/o Campbell Corporate Services Limited, 4th Floor, Scotia Centre, P.O. Box 268, George Town, Grand Cayman, Cayman Islands." Doc. 10, at 2 (¶ 3).  Speedboat described Rambler as "an entity formed under the laws of Delaware with an address at 2711 Centerville Road, New Castle, Delaware 19808;" *id.*, (¶ 4); and the Agreement similarly described Rambler as a "Delaware limited liability company" with the same Centerville Road address in Wilmington, Delaware, Doc. 10-3, at 2. *See also* Doc. 46 (Rambler's proposed "Second Amended Counterclaims"), at 21 (¶¶ 1-2) (describing Rambler as limited liability company formed in Delaware with offices in New Castle).  Finally, Speedboat described Federal as "a corporation incorporated under the laws of Indiana, with its principal place of business in Warren, New Jersey." Doc. 10, at 2 (¶ 5); *see also* Doc. 1, at 2 (¶ 2).

The Court notes that Speedboat's respective descriptions of Speedboat and Rambler as "an entity" in the Third Party Complaint were insufficient to establish their citizenship.  If they are limited liability companies, "the citizenship for diversity purposes of a limited liability company . . . is the citizenship of *each of its members*." *Wise v. Wachovia Securities, LLC*, 450 F.3d 265, 267 (7th Cir. 2006)(emphasis added), *cert. denied,* 549 U.S. 1047 (2006).  Specifically, the "citizenship of a limited liability company is not the state in which it is organized or has its principal place of business, but rather, each of the states in which it has members." *Lewis v. Allied Bronze LLC*, No. 07 Civ. 1621(BMC), 2007 WL 1299251, at *1-2 (E.D.N.Y. May 2, 2007) (citing *Handelsman v. Bedford Vill. Assoc. Ltd. P'ship*, 213 F.3d 48, [51-52] (2d Cir. 2000) and remanding removed action for lack of diversity jurisdiction).

And if any party or member of a limited liability company is a corporation, for diversity purposes, "a corporation shall be deemed to be a citizen of every State and foreign state by which

Speedboat thereafter filed an "Amended Third-Party Complaint" [Doc. 20] pursuant to Federal Civil Rule 15(a)(1)(B), as a "matter of course."[13]  In that pleading, Speedboat asserted that if "Plaintiff [was] held to be not responsible to pay Speedboat on its claim for damages to said 'spars and sails,' this Court should enter a judgment that Rambler is liable to and must pay Speedboat for such damages pursuant to the terms of the Share Issuance and Shareholder Agreement." Doc. 20, at 2 (¶ 2).  Also, in this amended pleading, Speedboat based the Court's jurisdiction solely upon supplemental jurisdiction, no longer citing diversity of citizenship between Speedboat and Rambler. *Id.*, at 2-3 (¶ 6). Speedboat simply alleged that "the claims in this Third-Party Complaint are so related to the claims in the Complaint previously filed by the Plaintiff [Federal] that they form part of the same case or controversy."  *Id.*

Rambler filed counterclaims against Speedboat for breaches of the Agreement and for failing to disclose to Rambler that the keel fin was dangerously defective.  In its pleading, Rambler, like Speedboat, pled that the Court has supplemental jurisdiction over its claims under 28 U.S.C. § 1367.  *See* Doc. 29 (Rambler's Answer to Amended Third Party Complaint), at 15 (¶ 3).  As pled by Speedboat and Rambler, all claims between them ultimately became "based only on the Court's section 1367 supplemental jurisdiction" without citing an underlying jurisdictional basis.[14] *See* Doc.

---

it has been incorporated and of the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332(c)(1).  If Speedboat and Rambler are actually corporations, Speedboat failed to provide their principal places of business.

[13] Speedboat filed its Amended Third-Party Complaint [Doc. 20] on January 4, 2013, which was within twenty-one (21) days after Rambler filed its responsive pleading ("Answer") [Doc. 17] to Speedboat's original Third-Party Complaint, on December 14, 2012.  *See* Fed. R. Civ. P. 15(a)(1)(B) ("A party may amend its pleading once as a matter of course . . . if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading . . . .").

[14] As set forth *supra*, n.12, Speedboat failed to identify itself as a corporation or a limited liability company.  In the Amended Third-Party Complaint, Speedboat once again identified itself

45 (Speedboat's brief), at 5.

Thereafter, the Court referred the action to Magistrate Judge Joan G. Margolis for a settlement conference in January of 2013. That conference occurred in March of 2013 and was followed by a second conference in May of 2013. The entire case did not settle. However, on June 7, 2013, Federal and Speedboat filed a "Stipulation of Discontinuance," which stated that "plaintiff's action against the defendant Speedboat Racing Ltd[.] is hereby discontinued with prejudice and without cost to either party." Doc. 43, at 1. Federal was terminated as Plaintiff in this action and, as Speedboat asserts, "the only remaining, unsettled claims in this suit are the claims between Speedboat and Rambler."[15] Doc. 45, at 5.

The first motion the Court will resolve is Speedboat's motion to dismiss for lack of subject matter jurisdiction. Speedboat argues that due to changed circumstances – the termination of Federal as Plaintiff in this action –the Court lacks subject matter jurisdiction. *Id.* Specifically, "the

---

as "an entity" and further described itself as "formed under the laws of the Cayman Islands," but then specified its  "principal place of business [as located] at 33 Gilliam Lane, Riverside, Connecticut." Doc. 20, at 2 (¶ 3).  If Speedboat were a corporation, such allegations would make it a citizen of the Cayman Islands and Connecticut.  However, if Speedboat is actually a limited liability company, no facts provide the identity and citizenship of each and all of its members, and there is thus no basis to determine citizenship for diversity purposes.

[15]   Pursuant to Federal Civil Rule 41(a), the plaintiff may voluntarily "dismiss an action without a court order by filing: . . . a stipulation of dismissal signed by all parties who have appeared." Fed. R. Civ. P. 41(a)(1) (A) (ii).  Otherwise, "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." *Id.* 41(a)(2). In light of the fact that Rambler had appeared in the action, filed an answer and counterclaims, and did not sign the dismissal of Federal's claims against Speedboat, the Court will approve said dismissal *nunc pro tunc* to remove any question as to whether the Court deemed said dismissal proper in terminating Federal from the action.  Federal and Speedboat signed the stipulation of dismissal and Rambler filed no objection. The case proceeded between Speedboat and Rambler without either party asserting that it had been  prejudiced by the dismissal of Federal's claims.

remaining parties in this case lack diversity of citizenship."[16]  Doc. 45, at 4.  Speedboat thus urges

the Court to dismiss the remaining claims, focusing on the balance of the "traditional values of

judicial economy, convenience, fairness, and comity."  Doc. 45, at 7 (citing *Kolari v. New York-*

*Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006)).  Because the Court "has not expended

significant resources on the case or addressed any substantive dispositive motions, Speedboat

respectfully requests that the Court exercise its discretion, pursuant to 28 U.S.C. § 1367(c)(3),

to dismiss Speedboat's claims without prejudice and to dismiss the claims of the Third-[P]arty

Counterclaim Plaintiff, Rambler 100 LLC."[17]  Doc. 45, at 4.

Rambler "concedes that this Court has no diversity jurisdiction over this case," Doc. 48, at

5.  However, Rambler  objects to Speedboat's "Motion to Dismiss" and moves for leave to amend

its pleadings to "clarify that this Court has (a) admiralty jurisdiction pursuant to 28 U.S.C. § 1333

over all of Speedboat's claims and over six of Rambler's counterclaims because they concern a

maritime contract and (b) supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Rambler's two

additional counterclaims because they form part of the same case or controversy."  Doc. 48, at 4.  In

particular, Rambler asserts that the parties' pleadings demonstrate that the "Share Issuance and

Shareholder Agreement" is a maritime contract and that agreement's choice-of-law provision does

---

[16]  In its brief in support of the pending motion to dismiss,  Speedboat specifies that "[b]oth remaining parties in this action are citizens of Connecticut."  Doc. 45, at 6.  In particular, "Rambler is a Delaware limited liability company" with "its principal place of business [located at] One Financial Plaza, Hartford, CT" and "Speedboat is a Cayman Islands entity, with its principal place of business in Connecticut."  *Id.*  As set forth *supra*, these allegations are insufficient for the Court to assess citizenship of the parties, which appear to be limited liability companies, so that the citizenship of each party's members would have to be established.

[17]  Pursuant to 28 U.S.C. § 1367(c)(3), "[t]he district courts may decline to exercise supplemental jurisdiction over a claim . . . if – . . . the district court has dismissed all claims over which it has original jurisdiction."

not defeat admiralty jurisdiction.   In sum, Rambler concludes that the Court has admiralty subject matter jurisdiction and may move forward with this action.

The Court will resolve Speedboat's "Motion to Dismiss" [Doc. 44] by determining whether this Court's admiralty jurisdiction extends to the remaining disputes between the remaining parties, Speedboat and Rambler.  If the Court has subject matter jurisdiction on that basis, the Court will also rule on  Rambler's "Motion for Leave to Amend" [Doc. 46] its Answer and Counterclaims, Speedboat's "Motion to Stay Discovery" [Doc. 52], and  Rambler's "Motion to Compel Discovery" [Doc. 57].

## II.  DISCUSSION

### A.  Speedboat's Motion to Dismiss for Lack of Subject Matter Jurisdiction

#### 1.  Subject Matter Jurisdiction

Federal district courts are courts of limited jurisdiction under Article III, Section 2 of the United States Constitution.  *See, e.g., Chicot Cnty. Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 376 (1940), *reh'g denied*, 309 U.S. 695 (1940). The question of subject matter jurisdiction is fundamental so that a court must raise the issue *sua sponte*, of its own accord, when the issue is not addressed by the parties.  *Mansfield, Coldwater & Lake Michigan Rwy. Co. v. Swan*, 111 U.S. 379, 382 (1884).  *See also Joseph v. Leavitt*, 465 F.3d 87, 89 (2d Cir. 2006) ("Although neither party has suggested that we lack appellate jurisdiction, we have an independent obligation to consider the presence or absence of subject matter jurisdiction *sua sponte*."), *cert. denied*, 549 U.S. 1282 (2007); *Univ. of South Alabama v. American Tobacco* Co., 168 F.3d 405, 410 (11th Cir. 1999) ("a federal court is obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking").

If subject matter jurisdiction is lacking, the action must be dismissed.  *See* Fed. R. Civ. P.

12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").  *See also  Manway Constr. Co. v. Housing Auth. of Hartford,* 711 F.2d 501, 503 (2d Cir. 1983) ("It is common ground that in our federal system of limited jurisdiction any party or the court *sua sponte,* at any stage of the proceedings, may raise the question of whether the court has subject matter jurisdiction; and, if it does not, dismissal is mandatory.") (citations omitted).

In general, a federal district court may exercise subject matter jurisdiction over an action if there is either:  (1)  "federal question" jurisdiction, applicable to "all civil actions arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331; or (2) there exists  "diversity of citizenship," complete diversity of citizenship between the plaintiff and all defendants and the amount in controversy "exceeds the sum or value of $75,000, exclusive of interest and costs," 28 U.S.C. § 1332(a).[18]  *See also Strawbridge v. Curtiss,* 3 Cranch 267, 1806 WL 1213,  at *1 (February Term 1806);  *Da Silva v. Kinsho Int'l Corp*., 229 F.3d 358, 363 (2d Cir.2000) (delineating two categories of subject matter jurisdiction).

In the case at bar, there are no pending federal claims.  Moreover, neither Speedboat nor Rambler has presented sufficient facts to establish its citizenship for diversity purposes as either a limited liability company or a corporation.  *See* n.12, *supra*.  Therefore, if diversity of citizenship were asserted as the only potential basis for subject matter jurisdiction, the Court would be forced to inquire further of the parties regarding their citizenship.[19]  However, the Court has an additional,

---

[18]  *See also St. Paul Fire and Marine Ins. Co. v. Universal Builders Supply*, 409 F.3d 73, 80 (2d Cir. 2005) ("Diversity is not complete if any plaintiff is a citizen of the same state as any defendant.")  (citing  *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373-74 (1978)).
Also, with respect to timing of citizenship, "[i]n an action in which jurisdiction is premised on diversity of citizenship, diversity must exist at the time the action is commenced,"  *Universal Licensing Corp. v. Lungo*, 293 F.3d 579, 581 (2d Cir. 2002).

[19]  As set forth *supra*, neither Speedboat nor Rambler alleges that there is diversity.

alternative basis for subject matter jurisdiction: admiralty jurisdiction. As requested by Speedboat, and in light of the parties' agreement that there is no diversity jurisdiction, the Court will address admiralty jurisdiction before investigating the citizenship of the parties, if necessary.[20]

## 2.   **Admiralty Jurisdiction**

Pursuant to 28 U.S.C. § 1333(1), Congress granted district courts "admiralty" jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." That jurisdiction encompasses "all contracts . . . which relate to the navigation, business, or commerce of the sea." *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 199 (2d Cir. 1992) (internal quotation marks and citations omitted), *aff'd*, 968 F.2d 196 (2d Cir. 1992); *accord Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading, Inc.*, 697 F.3d 59, 65 (2d Cir. 2012) ( "[T]he delegation of cognizance of 'all civil cases of admiralty and maritime jurisdiction' to the courts of the United States . . . extends over all contracts, (wheresoever they may be made or executed, or whatsoever may be the form of the stipulations,) *which relate to the navigation, business or commerce of the sea*.") (quoting *DeLovio v. Boit*, 7 F.Cas. 418, 444 (C.C.D. Mass.1815) (No. 3,776) (Story, *J.*) (emphasis added)).

"Admiralty jurisdiction over contract claims is determined by reference to the nature and

---

[20] The Court notes that both Speedboat and Rambler allegedly have their "principal places of business" located in Connecticut. Speedboat's offices are located at "33 Gilliam Lane, Riverside, Connecticut;" and Rambler has offices located at "One Financial Plaza, Hartford, Connecticut." Doc. 20, at 2 (¶¶ 3-4). Moreover, Speedboat's principal, Alexander E. Jackson, who is a proposed defendant to Rambler's amended counterclaims, allegedly resides at "33 Gilliam Lane, Riverside, Connecticut." *See* Doc. 46, at 21 (¶ 3). Therefore, if Jackson's Connecticut address is, and was at the commencement of the action, actually his *domicile* – "his true, fixed and permanent home and place of habitation" – he is a citizen of Connecticut. *See Martinez v. Bynum*, 461 U.S. 321, 331 (1983). Although the Court cannot determine the citizenship of the parties without additional information, it is certainly possible that, as Speedboat asserts, Speedboat, Jackson, and Rambler are citizens of Connecticut. Doc. 45, at 6.

subject of the contract." *Ziegler v. Rieff*, 637 F. Supp. 675, 677 (S.D.N.Y. 1986).[21]   *See also Commercial Union Ins. Co. v. Blue Water Yacht Club Ass'n*, 239 F. Supp. 2d 316, 319 (E.D.N.Y. 2003). "The crucial question is whether the relevant agreement has a 'maritime flavor.'" *Ziegler,* 637 F. Supp. at 677 (citation omitted).

As the United States Supreme Court has articulated, "[t]he only question is whether the transaction relates to ships and vessels, masters and mariners, as agents of commerce." *Kossick v. United Fruit Co.*, 365 U.S. 731,  736 (1961) (citation and quotation marks omitted).[22]   *See also, e.g., Omaha Indem. Co. v. Whaleneck Harbor Marina, Inc.*, 610 F.Supp. at 154, 155-56 (E.D.N.Y. 1985) (When a contract "relates to ships in their use as ships or to commerce or transportation in navigable waters, there is admiralty jurisdiction.") (citation, internal quotation marks, and bracket omitted).

For example, it is well established that contracts relating to service or repair of a vessel are maritime in nature. *Ziegler*, 637 F. Supp. at 677  (citation omitted).  Moreover, contracts providing for seasonal storage of a vessel are maritime contracts.  *Id.  See also Selame Assoc., Inc. v. Holiday Inns, Inc.*, 451 F.Supp. 412, 418 (D.Mass.1978) ("A contract to provide wharfage or storage is a maritime contract and a breach of this contract is cognizable in admiralty.")(citations omitted)..

In addition, an admiralty court generally has jurisdiction over contracts to charter a boat or vessel.  *Armour & Co. v. Ft. Morgan S.S. Co.*, 270 U.S. 253, 256 (1926) (a "charter party" is a maritime contract and "hence enforceable in a court of admiralty").  *See also Fednav, Ltd. v.*

---

[21]  Citing *Ford Motor Co. v. Wallenius Lines*, 476 F.Supp. 1362, 1365 (E.D.Va.1979) and *Schuster v. Baltimore Boat Sales, Inc.*, 471 F.Supp. 321, 322 (D.Md.1979)).

[22]  Traditionally,  it has been noted by the United States Supreme Court that "[t]he boundaries of admiralty jurisdiction over contracts – as opposed to torts or crimes – being conceptual rather than spatial, have always been difficult to draw." *Kossick v. United  Fruit Co.*, 365 U.S. 731, 735 (1961). "Precedent and usage" have been deemed "helpful" in making determinations on jurisdiction. *Id.*

*Isoramar*, S.A., 925 F.2d 599, 601 (2d Cir. 1991) ("It is well-established that a charter party agreement is a maritime contract.") (citing, *inter alia*, *Armour & Co.*, 270 U.S. at 259); *Jack Neilson, Inc. v. Tug Peggy*, 428 F.2d 54, 55 (5th Cir. 1970), *cert. denied*, 401 US. 955 (1971) ("We hold that the charter provisions of the contract are maritime in nature, are severable, and within the admiralty jurisdiction of the district court."). *See also, e.g.*, *Compass Marine Corp. v. Calore Rigging Co.*, 716 F. Supp. 176, 180 (E.D. Pa. 1989) (dispute arising out of charter agreement of vessel in service is cognizable under the admiralty and maritime jurisdiction of the federal courts), *aff'd sub nom., Appeal of Calore Rigging Corp.*, 891 F.2d 279 (3d Cir. 1989), *and aff'd,* 891 F.2d 280 (3d Cir. 1989); *Natasha, Inc. v. Evita Marine Charters, Inc.*, 763 F.2d 468, 468 (1st Cir. 1985) (holding "admiralty does have jurisdiction if the charter portion of the sale contract is readily 'separable' from the rest of the contract.").

On the other hand, in general, "[i]t is well settled that, while a contract for the use or charter of a vessel is maritime in nature, the contract for a sale of a vessel is non-maritime." *Sea Trade Mar. Corp. v. Coutsodontis*, No. 09-CV-488 (BSJ) (HBP), 2012 WL 3594288, at *4 (S.D.N.Y. Aug. 16, 2012) (citing, *inter alia*, *The Ada*, 250 F. 194, 196 (2d Cir. 1918)). *See also Aggelikos Prostatis Corp. v. Shun Da Shipping Grp. Ltd.,* 646 F. Supp. 2d 330, 332 (S.D.N.Y. 2009) ("It is 'elementary hornbook law that a contract for the sale of a vessel is not within the admiralty jurisdiction of the district courts.'") (quoting *Int'l Shipping Co., S.A. v. Hydra Offshore, Inc.*, 675 F.Supp. 146, 150 (S.D.N.Y.1987), *aff'd*, 875 F.2d 388 (2d Cir. 1989)); *Kalafrana Shipping Ltd. v. Sea Gull Shipping Co.*, 591 F. Supp. 2d 505, 507 (S.D.N.Y. 2008) ("It has long been the rule in the Second Circuit that a contract for the sale of a vessel is not a maritime contract."). *See also generally* 12 Am. Jur. 2d Admiralty § 60 ("A contract for the sale of a vessel is generally not within a federal court's admiralty

jurisdiction because such a contract is not maritime in nature.").

Nonetheless, if the maritime part of a contract is the primary objective of the contract and/or separable from the nonmaritime part, then admiralty jurisdiction exists. *See, e.g.*, *Compagnie Francaise De Navigation a Vapeur v Bonnasse*, 19 F.2d 777, 779-80 (2d Cir. 1927) (Hand, *J.*), *cert. denied*, 275 US 551 (1927); *Atl. Mut. Ins. Co.*, 775 F. Supp. at 104. *See also  Sirius Ins. Co. (UK) v. Collins,* 16 F.3d 34, 36 (2d Cir. 1994) ("The test [for determining a maritime contract] has . . . been loosened considerably so that admiralty jurisdiction is held to cover also contracts whose nonmaritime elements are 'incidental' to a primarily maritime purpose, as well as the separable maritime portions of mixed contracts that are not primarily maritime, if these can be separately litigated without prejudice.") (citations omitted); *Tradhol Int'l, S.A. v. Colony Sugar Mills Ltd.*, No. 1:09-CV-00081 (RJH), 2009 WL 2381296, at *5 (S.D.N.Y. Aug. 4, 2009) ("The premise of the severability doctrine is that a court may divide a contract into its component parts and pronounce some but not all of them 'salty.'"), *aff'd*, 354 F. App'x 463 (2d Cir. 2009); *Jack Neilson, Inc. v. Tug Peggy*, 428 F.2d 54, 60 (5th Cir. 1970) ("it has long been recognized that where the maritime elements of a contract are susceptible to separate adjudication admiralty jurisdiction may be exercised to that extent") (citation and internal quotation marks omitted), *cert. denied*, 401 U.S.  955 (1971) .  *See also generally*  29 A.L.R. Fed. 325, II. § 6[a] (captioned "Mixed contracts") ("where a contract contains both maritime and nonmaritime covenants, . . . admiralty may assume jurisdiction of a claim based upon the maritime part of the contract").

Recently, courts have blurred the bright line between the sale of a vessel and certain maritime provisions to find that "when determining whether a contract is a maritime contract, one should focus on whether the principal objective of the contract is maritime commerce, rather than on whether the non-maritime components are properly characterized as more than 'incidental' or 'merely incidental'

to the contract." *Kalafrana Shipping Ltd. v. Sea Gull Shipping Co. Ltd.*, 591 F. Supp. 2d 505, 509 (S.D.N.Y. 2008).[23]   As Justice O'Connor articulated on behalf of a unanimous Supreme Court in *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 14 (2004), "the fundamental interest giving rise to maritime jurisdiction is the protection of maritime commerce. . . . [and] [t]he conceptual approach vindicates that interest by focusing the Court's inquiry on whether the principal objective of a contract is maritime commerce."  *See also Sirius Ins. Co. (UK) v. Collins*, 16 F.3d 34, 36 (2d Cir. 1994) ("the court should consider 'whether an issue related to maritime interests has been raised,' 968 F.2d at 199, bearing in mind that the 'fundamental interest giving rise to maritime jurisdiction is the protection of maritime commerce.'") (citing and quoting *Atlantic Mutual Ins. Co. v. Balfour Maclaine Int'l, Ltd.*, 968 F.2d 196, 200 (2d Cir. 1992)(some internal quotation marks omitted).

Under this "conceptual" or "principal objective" approach, endorsed by the Second Circuit, "if the maritime elements of a contract are the principal or primary objective of the contract," there is admiralty jurisdiction. *F.H. Bertling Holding KG v. Ranhill Engineers & Constructors Sdn. Bhd.*, 591 F. Supp. 2d 377, 383 (S.D.N.Y. 2008) (citing, *inter alia*, *Folksamerica Reinsurance Co. v. Clean Water of New York, Inc.*, 413 F.3d 307, 314-15 (2d Cir. 2005)).   Alternatively, employing the "severability" exception, if "the claim [at issue] arises from a breach of maritime obligations that are severable from the non-maritime obligations of the contract," there is "federal maritime jurisdiction." *F.H. Bertling Holding KG*, 591 F.Supp. 2d at 383 (citation omitted).

Implementing the conceptual approach to determine whether there is admiralty jurisdiction, the Court must focus its inquiry on whether the nature of the contract or transaction includes maritime elements: whether provisions relate to the navigation, business or commerce of the sea.

---

[23] Discussing and citing *Folksamerica Reinsurance Co. v. Clean Water of New York, Inc.*, 413 F.3d 307, 309 (2d Cir. 2005) and *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 14 (2004).

16

If the Court finds that the primary objective of the contract is maritime in nature, there is admiralty jurisdiction.  Otherwise, under the severability test, if certain components of the contract are maritime, while others are not, the Court must  determine whether the maritime provisions are separable from the non-maritime ones.  If the maritime provisions  are separable, there is admiralty jurisdiction over the claims arising under them.

### 3.      Interpretation of the Agreement:   Co-Ownership and/or Lease

"The rules for the construction and interpretation of maritime contracts are essentially the same as those delineated in the non-maritime caselaw." *Sea Hunters, LP v. S.S. PORT NICHOLSON*, No. 2:08-CV-272 (GZS), 2015 WL 1206487, at *10 (D. Me. Mar. 17, 2015).  The Court thus turns to the terms of the Agreement to determine their intended meaning.

The basic principles of contract interpretation under Connecticut law, which governs, are well established: "(1) [t]he intention of the parties is controlling and must be gathered from the language of the [contract] in the light of the circumstances surrounding the parties at the execution of the instrument; (2) the language must be given its ordinary meaning unless a technical or special meaning is clearly intended; [and] (3) the [contract] must be construed as a whole and in such manner as to give effect to every provision, if reasonably possible." *Sartor v. Town of Manchester*, 312 F. Supp. 2d 238, 242-43 (D. Conn. 2004) (quoting *Peter-Michael, Inc. v. Sea Shell Assoc.*, 244 Conn. 269, 275 (1998)). The parties' "intention is to be determined from the language used, the circumstances, the motives of the parties and the purposes which they sought to accomplish." *Sartor*, 312 F.Supp.2d at 243 (citing *Peter-Michael*, 244 Conn. at  276).  Where the language of a contract is clear and unambiguous, the court's determination of contractual intent becomes a question of law for the court. *See, e.g.*, *Tallmadge Bros., Inc. v. Iroquois Gas Transmission Sys., L.P.*, 252 Conn.

479, 495 (2000) ("the interpretation and construction of a written contract present only questions of law, within the province of the court . . . so long as the contract is unambiguous and the intent of the parties can be determined from the agreement's face") (quoting 11 S.Williston, *Contracts*, at 77-83 (§ 30:6) (4th ed. 1999)).

"Contract language is unambiguous when it has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion."   *Brunoli v. Brunoli & Sons*, 993 F.Supp. 66, 73 (D.Conn.1997) (quoting *Care Travel Co. v. Pan Am. World Airways*, 944 F.2d 983, 988 (2d Cir. 1991)).  Moreover, "the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." *Levine v. Massey*, 232 Conn. 272, 279 (1995).  Rather, the court must give the terms "their natural and ordinary meaning," *Kelly v. Figueiredo*, 223 Conn. at 31, 35 (1992), and interpret them "with each provision read in light of the other provisions,"  *United Illuminating Co. v. Wisvest-Connecticut, LLC*, 259 Conn. 665, 670 (2002).

In the case at bar, the Agreement's terms are clear and unambiguous and  should be given their natural and ordinary meaning.  Their interpretation by the Court thus presents a question of law.

The Agreement, entitled "Share Issuance and Shareholder Agreement," states that 49,999 out of 50,000 shares of Speedboat –  "a Cayman Islands exempted company limited by shares"  – each valued at one dollar ($ 1.00),  are owned by one Alexander Jackson.  Doc. 10-3, at 2.  The remaining individual share ("New Share") was to be  issued to Rambler for the purchase price of "One Dollar," and  become "redeemable by [Speedboat] upon the terms set forth" in the Agreement, which included, if no prior terminating event occurred, automatically upon termination of the Agreement

(*i.e.*, after the conclusion of the races for which the Yacht was leased).[24]  *Id.*  During the entire term of the Agreement, the sole Director of Speedboat was and would continue to be "Alexander E. Jackson," *id.*, at 4 (§ 3.1); and Speedboat was and would remain "the record owner of the Yacht," *id.*, at 9 (§ 4.2(b)).

Most importantly to Rambler, under the Agreement, Rambler obtained "[e]xclusive use of the Yacht" to participate in the series of "eight races in the Atlantic Ocean Racing Series in 2011." *Id.*, at 4-5 (§ 4.1).  In return, Rambler was required to pay all operating expenses, repair and maintenance costs, racing fees, crew employee salaries and benefits, and all ancillary costs of such races. [25] *Id.*, at 5 (§ 4.1(a)).

Even during the races, Speedboat retained certain control over the Yacht by requiring Rambler to hire Speedboat's captain, Chris Higgins, on a full-time basis "through the last race sailed under this Agreement," and hire crew member Bill Erkelens to serve "as a crew member in each sailboat race in which the Yacht participates."[26] *Id.*, at 5 (§ 4.1(b)).  Furthermore, Speedboat placed "Use Restrictions" on Rambler's use of the yacht, limiting operation "to the navigational limits as

---

[24]  The Agreement clarifies that "[p]rior to the Closing Date, all of the issued and outstanding shares of the Company are owned by [Jackson], beneficially and of record;" and that "[u]pon the issuance of the New Share to Rambler, . . . Rambler will own one percent (1.00%) of all of the issued and outstanding shares of the Company." Doc. 10-3, at 3 (§ 2.2).  However, Rambler was expressly prohibited from selling its sole share.  *Id.*, at 4 (§ 2.5) ("Rambler shall not sell the New Share").  Rambler was also prohibited from placing any lien on the New Share and/or assigning any other party to use the Yacht.  *Id.*

[25]  With respect to insurance during the Agreement's term, as set forth *supra*, Rambler was required to insure the Yacht and its equipment against loss or damage and to list Speedboat as the loss payee.  Doc. 10-3, at 6 (§ 4.1(f)).

[26]  Jackson also secured the right to bring "one guest from a list provided by [him] to Rambler" to "sail on the Yacht in any racing event in which the Yacht participates during the Term." Doc. 10-3, at 8 (§ 4.1(n)(1)).

set forth in the Yacht's insurance policy," mandating use "for pleasure" purposes only, and banning drugs and weapons on board.    *Id.*, at 6 (§ 4.1(e)).    Speedboat also banned "any permanent modifications to the Yacht" unless listed in the Agreement and/or after "prior written express consent of [Jackson]."  *Id.*, at 8 (§ 4.1(m)).    Furthermore, Rambler could not rename the Yacht or change "associated graphics" unless "all such changes shall be reversed at the end of the [Agreement's] Term at the expense of Rambler."  *Id.*

### 4.  <u>Jurisdiction over the Pending Claims</u>

There are essentially two components to the "Share Issuance and Shareholder Agreement" (herein "Agreement")  with respect to the Yacht: (1) a sale of one share of ownership  ("one (1) redeemable share of a nominal par value of U.S. $1.00") in Speedboat, Doc. 10-3, at 2; and (2) a charter or lease for the use of the Yacht for a set period to sail in the 2011 season of the Atlantic Ocean Racing Series, *id.*, at 4-5 (§ 4.1).  The first contract component of a sale is non-maritime in nature.  *See, e.g., The Ada*, 250 F. at 196.  However, the second portion of the Agreement, the lease or charter of the Yacht for the specified racing season,  is maritime by its terms.  *See, e.g., Armour & Co.*, 270 U.S. at 256.[27]

At its core, this was an agreement for Rambler to sail a world-class yacht in a series of international races in the hopes of securing victory.  The Agreement's maritime charter provisions contain what was manifestly the primary objective of the contract: to provide Rambler with the exclusive use of the Yacht in the 2011 Atlantic Ocean Racing Series.  The sale of one share of Speedboat to Rambler was incidental to the charter (in this case, according to Speedboat to ensure

---

[27] *See also generally* 29 James Wm. Moore, et al., *Moore's Federal Practice*, ¶ 703.04(c)(vi) (3d ed. 2013) ("An integral part of the maritime industry is the hiring and letting of part or all of a vessel.  These types of agreements are referred to as charter parties.  It is logical that these kinds of contracts have long been deemed maritime ones.").

that the charter was legal).[28]  Therefore, under the Second Circuit's "conceptual" test, the Agreement

is maritime in nature, giving rise to admiralty jurisdiction.

Moreover, even if the charter were not the primary objective of the Agreement, the charter

provisions are separable from the stated sale of the Speedboat share.  Therefore, employing

"severability," even if the primary objective of the Agreement were not the charter, there is admiralty

jurisdiction over the claims at bar under the "separable provision" test.

Examining the terms giving rise to the charter, Section 4.1(a) of the Agreement provides

Rambler with  "[e]xclusive use of the Yacht" from October 14, 2010 to March 15, 2012 for racing

purposes.[29]  Doc. 10-3, at 4 (§ 4.1).  The intended races of the Yacht are described  as "eight races

in the Atlantic Ocean Racing Series in 2011 . . . with the objective of winning the Atlantic Ocean

Racing Series  overall,  winning a majority of the races entered, and setting records."  *Id.*,  at  4-5

(§ 4.1(a)).

"As a condition to Rambler's exclusive use of the Yacht," Rambler agreed to "pay all

operating expenses, repair  and  maintenance costs for  the Yacht and its Equipment."  *Id.*,  at 5

(§ 4.1(a)).  In addition, pursuant to Section 4.1(b), Rambler agreed to retain two former Speedboat

crew members.  Specifically, Rambler was bound to  retain the "current captain of the Yacht," Chris

Higgins, on a full time basis and with "a competitive salary consistent with the other senior members

of the Yacht's crew;" and Rambler was  required to hire Bill Erkelens as a crew member in each

---

[28]  *See* n.33, *infra*.

[29]  Defined in common terms, a "bareboat charter" refers to "[t]he leasing or hiring of [a] .
. . ship, or other vessel" when "the shipowner surrenders possession and control of the vessel to the
charterer, who then succeeds to many of the shipowner's rights and obligations."  *Black's Law
Dictionary* (10th ed. 2014).  Under such a charter, "[t]he charterer takes possession and operates the
ship during the period of the charter as though the vessel belong[s] to the charterer." *Id.*

sailboat race in which the Yacht would participate.[30]  *Id.*

Under Section 4.1(c), Jackson and Speedboat agreed to "deliver the Yacht . . . to Rambler at Newport Shipyard, Newport, Rhode Island," or at another agreed upon location, in "ship shape, sailable  racing condition" and to inform Rambler of any "conditions, flaws, damages, or defects (latent or otherwise) of the Yacht which would render or cause the Yacht not to be in ship shape, sailable racing condition." *Id.*, at 5 (§4.1(c)).  Section 4.1(d) outlined the terms for redelivery of the Yacht by Rambler to Jackson and Speedboat at the conclusion of the Agreement's term; and Section 4.1(e) defined restrictions on the use of the Yacht, including the navigational limits of the Yacht's operation.  *Id.*, at 6 (§4.1(e)).

These provisions are typical of those found in maritime contracts of charter party.  By the same token, the claims Speedboat asserts against Rambler in its Third Party Complaint, and Rambler asserts in its counterclaims to that pleading, are typical of the sort traditionally charged as breaches of a maritime charter.  For example, Count One alleges that Rambler "fail[ed] to return the Yacht in as good a condition as when delivery was taken . . . pursuant to the Lease Agreement."  Doc. 20, at 6 (¶ 26) (relating to § 4.1(d)).  Count Two seeks declaratory judgment that Rambler failed to secure adequate insurance coverage of the Yacht pursuant to the terms of the Lease Agreement.  *Id.*, at 6 (¶ 29) (relating to § 4.1(f)).  Count Three alleges that "as a condition to Rambler's exclusive use of the Yacht," Rambler was obligated to pay "all operating expenses, repair and maintenance costs for the Yacht," and Rambler "fail[ed] to maintain and repair the Yacht, including repairs resulting in major equipment failures." *Id.*, at  7  (¶¶  34-35) (relating to § 4.1(a)).  Finally, Count Four seeks

---

[30]  In addition,  under the Agreement, Jackson and a guest were permitted to accompany the Yacht on all races and to be included as members of Rambler's crew at their request.  Doc. 10-3, at 8 (§ 4.1(n)(1)).

attorneys' fees pursuant to Section 5.5 of the Lease Agreement.  *Id.*, at 8 (¶ 38) (relating to "Miscellaneous Provisions" in § 5, pertaining to the entire Agreement).

In addition, as Rambler asserts, four of its proposed counterclaims, "as set forth in its proposed amended pleadings, concern Jackson's and Speedboat's breaches of Sections 4.1, 4.1(a), and 4.1(c) of the Agreement," and therefore also relate to the charter or lease of the Yacht.[31]  Doc. 48 (Rambler's Brief), at 8 (citing Doc. 48-1, Counts I-IV, at 21-24).  In addition, as Rambler states, another of its causes of action "concerns Jackson's and Speedboat's breach of the Agreement's implied covenant of good faith and fair dealing for, among other things, refusing to allow Rambler to repair the Yacht so that it could continue to use the Yacht through the end of the term of the Agreement."  Doc. 48, at 8 (citing Doc. 48-1, Count VI, at 25-27).  That cause relates to the repair provisions of the charter portion of the Agreement (§ 4.1(a)). Yet another cause of action, Rambler alleges, "is based on Speedboat's breach of the Agreement's implied warranty of seaworthiness."  Doc. 48, at 8 (citing Doc. 48-1, Count V, at 24-25) (relating to "Delivery of the Yacht" in "ship shape, sailable  racing condition," pursuant to § 4.1(c)).  In sum, according to Rambler, each of these "foregoing causes of action is based explicitly upon the breach of the Agreement, a maritime contract that concerns the *use of a ship as a ship* and that *directly relates to the ship's operation, navigation, and management afloat*."  Doc. 48, at 8 (emphasis added).

Given these circumstances, there is no substance to Speedboat's contention that the Agreement is not maritime in nature, but rather "a shareholders' agreement by which Jackson and Defendant became co-owners of [the] Speedboat entity, provided for its governance, provided that

---

[31]  Even prior to any amendment, three of Rambler's claims are expressly based upon breach of the Agreement's charter terms.  Rambler's present counterclaims concern Speedboat's breaches of Sections 4.1, 4.1(a), and 4.1(c) of the Agreement, as well as breach of the Agreement's implied covenant of good faith and fair dealing.  Doc. 17 (Counts I-V); *see also* Doc. 48, at 8 n.2.

Rambler would finance the maintenance and operation of the Yacht . . . , and provided Rambler as a co-owner with temporary use of the Yacht, subject to certain conditions."  Doc. 50, at 7.

Speedboat asserts that "a contract under which co-owners provide for the management and operation of a vessel is entirely non-maritime in character, and is distinguishable for purposes of admiralty jurisdiction from a third-party charter."  *Id.,* at 7-8 (citing, *inter alia*,  *Ward v. Thompson* (The Detroit), 63 U.S. 330, 333 (1859)).  This argument fails because Speedboat's interpretation of the Agreement as a "co-owners' management agreement" for operation of a vessel misses the mark. It exalts form (such as the caption, "Share Issuance and Shareholder Agreement") over substance. This is clearly not a case where, as Speedboat asserts,  Doc. 50, at 8, mutual co-owners agreed to purchase and operate a vessel together, as opposed to "one where an owner of a vessel engages another to manage or operate her." *Cf. Economu v. Bates*, 222 F. Supp. 988, 990 (S.D.N.Y. 1963) ("The parties . . . have agreed to purchase a vessel and thereafter to operate her for their mutual benefit; the profits were to be shared whether the operation was in the name of one or more individuals or through a corporate entity" and "[t]his is the essence of their arrangement.").

The essence of the contract at bar was not a joint enterprise.  Rather, examining the terms of the contract as a whole and interpreting all terms to give them their full meaning, the contract was primarily designed to provide Rambler with use of the Yacht "in ship shape, sailable racing condition" to participate in the Atlantic Ocean Racing Series.  Rambler's nominal, one-share ownership interest expressly and automatically terminated "upon completion of the [Agreement's] Term" and for the price of "One Dollar ($1.00)."[32]  Doc. 10-3, at 7 (§ 4.1(j)).  Thus, upon expiration

---

[32]  Speedboat opposes Rambler's argument that Speedboat's description of  the Agreement in its pleadings as a "Lease Agreement" suggests that Speedboat has conceded the existence of admiralty jurisdiction. Doc. 50, at 8 (discussing Doc. 48, at 4).  Speedboat explains that it "referred to the 'Share Issuance and Shareholder Agreement' as the 'Lease Agreement,' because that shorthand

of the contract, Speedboat resumed full ownership rights; and by January 1, 2012, Speedboat and

Jackson could even elect to "market or otherwise advertise the Yacht for sale."[33] *Id.*, at 7-8

(§§ 4.1(i), (j), (n)(2), (o)).

Speedboat accuses Rambler of using "far too simplistic a reading of the legal precedent

governing the distinction between maritime and non-maritime contracts" and concluding that "[t]he

---

characterization is consistent with Connecticut law governing the Agreement's terms for Rambler's use of the Yacht." Doc. 50, at 8.

In any event, the Court does not find subject matter jurisdiction based on a party's label for an agreement, but rather upon consideration of all contents of that agreement. The fact that the terms may have created a lease or charter arrangement for the vessel is the Court's concern, not whether Speedboat chose to characterize the Agreement's title in one way. After all, a party may not concede, forfeit, or waive subject matter jurisdiction over an action.

[33]   The Court notes that Speedboat provides a possible motive for granting a nominal ownership interest to Rambler:

> In fact, the Agreement *could not have been structured as a charter*, because the *Yacht could not legally be chartered upon the agreed business terms.* The Yacht was built in New Zealand and was under British Registry at the time of the Agreement. Ex. B. Under U.S. law, a vessel that has at any time been registered outside of the United States may not engage in "coastwide trade." 19 C.F.R. § 4.80(f); *see Gillentine v. McKeand*, 426 F.2d 717 (1st Cir. 1970). "Coastwise trade," as defined by 46 C.F.R. § 67.3, includes "the transportation of passengers or merchandise between points embraced within the coastwise laws of the United States." 46 C.F.R. § 67.3. In *Gillentine*, the First Circuit Court of Appeals held that "coastwise trade" is broad enough to prevent the chartering of a vessel for pleasure purposes. 426 F.2d at 720-21.

Doc. 50, at 10 (emphasis added). One can infer that Speedboat believed it was necessary to include an element of ownership by Rambler in the Agreement to make the contract legal. After all, the Yacht was to be delivered and returned to ports on the East Coast of the United States, Doc. 48-2, at 5, 6 (§§ 4.1(c)-(d)). However, Speedboat's broad interpretation of the overall contract as one in "coastwide trade" fails to take into account that nine of the eleven races specified were located outside the coastal waters of the United States. *See* Doc. 10-3, at 5 (§ 4.1(b)) (including, *inter alia*, the following races: Pineapple Cup - Montego Bay Race, RORC Caribbean 600, Les Voiles de St. Barth, Transatlantic Race 2011, Rolex Fastnet Race, Biscay Race, Les Voiles de St. Tropez, Rolex Middle Sea Race, Sydney-Hobart). The contract at bar was more than one for "transportation of passengers or merchandise between points embraced within the coastwise laws of the United States;" it also included several races to occur in foreign and/or international waters.

mere fact that a ship is involved will not bring the cause within the jurisdiction of the admiralty court."  Doc. 50, at 8 (citations omitted).  Speedboat sets up a straw man and energetically knocks it down, but the argument disregards reality.  Admiralty jurisdiction does not depend upon "the mere fact that a ship is involved" in the transaction between the parties.  On the contrary: for the reasons stated, the Court interprets the Agreement to contain both a nominal sale and a lease (or charter) of the Yacht for the 2011 Atlantic Ocean Racing Series. The pending claims between Speedboat and Rambler relate to the Agreement's primary and/or separable maritime provisions pertaining to that lease, and consequently fall within admiralty jurisdiction.

In sum, the main and severable purpose of the Agreement was to lease or charter to Rambler the Yacht to participate in races.  "Without doubt a contract for hire either of a ship or of the sailors and officers to man her is within the admiralty jurisdiction." *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961) (citing 1 Benedict, *Admiralty*, 366).[34]  Accordingly, the charter terms of the Agreement support admiralty jurisdiction in the present case.

### 5.      Choice of Law Provisions

Speedboat has argued that the Agreement's choice-of-law provision, stating that the Agreement "shall be governed by and construed in accordance with the laws of the State of Connecticut," Doc. 48-2 (¶ 5.4, at 9), defeats admiralty jurisdiction.  I do not agree.  The Second Circuit has clearly held that choice-of-law provisions, in and of themselves, do not defeat admiralty jurisdiction.  *See Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 49 (2d Cir. 2008) ("The fact that a choice-of-laws provision exists in a contract does not, by itself, remove the contract from the scope

---

[34] In *Kossick*, the Supreme Court further clarified that "Benedict goes on to quote from an anonymous commentary on the Mediaeval Statutes of Culm, one of the early sources of maritime law, that anything pertaining to navigation or seamen is to be considered a part of the maritime law." 365 U.S. at 736.

of maritime law.").  "To allow a plaintiff to elect a state forum would defeat the uniformity the

Constitution requires in maritime law." *Jack Neilson, Inc. v. Tug Peggy*, 428 F.2d 54, 60 (5th Cir.

1970), *cert. denied*, 401 U.S. 955 (1971).

> As one commentator aptly summarized:
>
> Defendant's counsel may not assert a failure of admiralty jurisdiction by reliance on
> provisions in a contract that its terms are to be governed exclusively by the laws of
> a particular state, on the ground that such provisions indicated the parties' intention
> to regard the contract as nonmaritime in nature, since a court may not be ousted of
> jurisdiction by agreement.

29 A.L.R. Fed. 325.  *See also, e.g., Ocean Sci. & Eng'g Inc. v. Int'l Geomarine Corp.*, 312 F. Supp.

825, 828-29 (D.Del. 1970) ("Once the contract is found to be maritime and within admiralty

jurisdiction, an agreement amounting to a private  repeal of 28 U.S.C. § 1333 would be a nullity.").

"As the Supreme Court explained, the first step of the analysis is determining whether

something is a maritime contract; then, once a contract has been deemed a maritime contract, the

next step is determining whether a specific state's laws should be used *to supplement* any area of

contract law for which federal common law does not provide."[35] *Williamson*, 542 F.3d at 49 (citing

*Norfolk S. Ry. Co. v. Kirby,* 543 U.S. 14, 27 (2004) (emphasis added)).  In *Norfolk S. Ry. Co.* the

Court said succinctly: "When a contract is a maritime one, and the dispute is not inherently local,

federal law controls the contract interpretation." 543 U.S. at 22-23.  *See also Szollosy v. Hyatt Corp.*,

396 F. Supp. 2d 159, 164 (D. Conn. 2005) ("In admiralty cases, federal maritime law applies where

it exists. State law may be imported to federal admiralty actions in limited circumstances, to supply

a rule of decision in areas where admiralty is silent.") (citing *Mentor Ins. Co. (U.K.) Ltd. v.*

---

[35] Initially, "federal law controls the procedural inquiry, namely, whether a plaintiff's claim
sounds in admiralty." *Blue Whale Corp. v. Grand China Shipping Dev. Co., Ltd.*, 722 F.3d 488, 494
(2d Cir. 2013).  Once a claim sounds in admiralty, the relevant substantive law governs whether a
plaintiff has alleged a valid prima facie claim.  722 F.3d at 495.

*Brannkasse*, 996 F.2d 506, 513 (2d Cir.1993)).

Admiralty speaks through the decisions of federal judges in admiralty cases, a body of law often referred to as "the general maritime law,"[36] and through acts of Congress addressing particular issues of a maritime nature.  "These, then, are the components of federal law in maritime cases: the general maritime law as above described, and applicable Acts of Congress." Gilmore and Black, *The Law of Admiralty,* at 47  (2d ed. 1975).

In the case at bar, the Court has found that a maritime contract exists for the use of the vessel, and the claims in dispute arise out of that contract.  Federal admiralty jurisdiction exists.  The application of Connecticut's state laws, as chosen by the parties,  may supplement certain  legal areas that the federal maritime law does not provide.  *See, e.g., Williamson*, 542 F.3d at 49*; Norfolk S. Ry. Co.*, 543 U.S. at 27;  *Farrell Lines Inc. v. Columbus Cello-Poly Corp.*, 32 F.Supp.2d 118, 127 (S.D.N.Y. 1997).  But the limited effect of Connecticut law does not extend beyond that.  Any such supplementation does not deprive this Court of admiralty jurisdiction, which is determined by the nature of the contract.

**6.     Summary on Admiralty Jurisdiction**

A century ago the United States Supreme Court held that admiralty jurisdiction extends only to "wholly maritime contracts" – *i.e.,* "contracts, claims, and services purely maritime, and touching right[s] and duties appertaining to commerce and navigation."  *The Eclipse,* 135 U.S. 599, 608 (1890)*.* However, this restriction has been modified over time. In *Compagnie Française de Navigation a Vapeur v. Bonnasse*, 19 F.2d 777 (2d Cir. 1927), Judge Learned Hand held that the fact

---

[36]  Chief Justice Marshall summarized this historic and creative process in *American Ins. Co. v. Canter*, 26 U.S. (1 Pet.) 511, 545-46 (1828): "A case in admiralty does not, in fact, arise under the Constitution or laws of the United States.  These cases are as old as navigation itself; and the law admiralty and maritime, as it existed for ages, is applied by our Courts to the cases as they arise."

that a contract encompasses both maritime and non-maritime subject matter does not prevent the court from exercising its admiralty jurisdiction.[37] If the maritime provisions predominate and/or can be separately enforced without prejudice to the other provisions, admiralty may take jurisdiction and enforce them. *See, e.g., Natasha, Inc. v. Evita Marine Charters, Inc.*, 763 F.2d 468, 471 (1st Cir. 1985) (finding admiralty jurisdiction over "charter" provisions of the contract where "both the record below and the contract at issue [made] it quite clear that [the lessee/buyer of vessel's] promise to 'charter' was a separate—and easily 'separable'—obligation over and above the [purchase] price").

In general, the sale of stock in a vessel transfers a percentage of ownership to the buyer. In the case at bar, the incidental sale of a $1.00 share or "New Share" in the Yacht created a temporary 1% interest in the vessel for Rambler. Upon termination of the contract, Rambler's New Share was automatically redeemed by Speedboat and Jackson. The Agreement's provisions giving rise to the sale were non-maritime in nature.

Sale of the New Share was not, however, the principal objective of the Agreement. Rather, the contract's main purpose was Speedboat's charter of the Yacht to Rambler to compete in the Atlantic Ocean Racing Series of 2011. By its terms, Rambler was granted use of the vessel for racing in a specified list of races; and Speedboat retained considerable control over the vessel by dictating terms for use during the races (including employing Speedboat's captain and one crew member). The charter provisions of the Agreement are distinctly maritime in nature and also separable from the sale of the New Share. The charter terms, and their alleged breaches, are also the bases of the majority of claims pending between Speedboat and Rambler. These claims address such issues as the proper use and repair of the Yacht. Pursuant to the primary and separable maritime

---

[37]  *Cert. denied*, 275 U.S. 551 (1927).

charter provisions in the Agreement, the Court possesses admiralty jurisdiction over this action.

The remaining two non-contract counterclaims, as proposed by Rambler, arise out of the same nucleus of operative facts which pertain to the formation and breach of the Agreement. These claims are "so related to claims in the action" within the Court's admiralty jurisdiction "that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The Court thus possesses supplemental jurisdiction over the non-contract claims pursuant to 28 U.S.C. § 1367.[38]

Finally, in light of the Court's admiralty jurisdiction, federal maritime law prevails. However, Connecticut state law, which was expressly chosen by the parties in the Agreement, will supplement legal areas that the federal common law does not provide, such as the elements of state law claims.

### 7.   Plaintiff's Request for Voluntary Dismissal of the Action under Rule 41, Fed. R. Civ. P.

Having found the existence of admiralty jurisdiction over this matter, the Court turns to the question of whether Speedboat may, in any event, withdraw this action. Speedboat was originally the defendant in this action, and then became the third-party plaintiff in suing Rambler and the defendant on Rambler's counterclaims. With the exit of Federal, Speedboat stands in the shoes of the plaintiff. Federal Rule 41(a) of Civil Procedure sets forth the procedures and grounds upon which a plaintiff may request a voluntary dismissal of an action.

---

[38]   Rambler's non-contract claims, as set forth in its amended pleadings – negligent misrepresentation and violation of Connecticut's Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b, *et seq*. – arise from the same set of facts as the contract claims. Namely, they address "Speedboat's failure to disclose to Rambler dangerous defects in the keel fin of the Yacht[,] which ultimately caused [it] to capsize in the Celtic Sea and nearly caused the loss of life." Doc. 48, at 9 (citing Doc. 48-1, Counts VII-VIII, at 27-29).

Specifically, under Rule 41(a)(1)(A), "the plaintiff may dismiss an action without a court order by filing: (i) a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment; or (ii) a stipulation of dismissal by all parties who have appeared." In general, such a dismissal is deemed "without prejudice."[39] In the case at bar, neither such circumstance has occurred to enable Speedboat to dismiss the action without court approval. Rambler, as the opposing party, has answered the third-party complaint and has not stipulated to dismissal of the action. In fact, Rambler opposes dismissal.

Consequently, Speedboat may only withdraw the action under Rule 41(a)(2) "by court order." Under that provision, "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." Moreover, "[i]f a defendant has pleaded a counterclaim before being served with the plaintiff's motion to dismiss, the action may be dismissed over the defendant's objection only if the counterclaim can remain pending for independent adjudication." Fed. R. Civ. P. 41(a)(2).

Rambler filed counterclaims prior to Speedboat's filing of the motion to dismiss; and Rambler has objected to dismissal of the action at this time. *See* Doc. 29 (Rambler's Answer) and Doc. 44 (Speedboat's Motion to Dismiss). Rambler's counterclaims, both pending and proposed, respond to and counter the claims brought by Speedboat so that allowing Rambler's claims to go forward independently would only necessitate Speedboat's refiling of its present claims as counterclaims. This would simply create a circular pattern going round like a carousel. In other words, a court cannot adjudicate Rambler's claims without considering Speedboat's counter-

---

[39] Rule 41 clarifies, however, that "if the plaintiff previously dismissed any federal - or state - court action based on or including the same claim, a notice of dismissal operates as an adjudication on the merits." Fed. R. Civ. P. 41(a)(1)(B).

allegations or counterclaims, and vice versa.   The claims of both parties arise out of the same nucleus of operative facts – namely, the parties' actions and duties in relation to the Agreement with respect to the charter of the Yacht.

In general, a court "has discretion to deny voluntary withdrawal." *Zagano v. Fordham Univ.*, 900 F.2d 12, 14 (2d Cir. 1990), *cert. denied*, 498 U.S. 899 (1990).   However, that discretion must be exercised after careful analysis.   "[T]he  presumption in this circuit is that a court should grant a dismissal pursuant to Rule 41(a)(2) absent a showing that defendants will suffer substantial prejudice as a result." *Harlem Teams for Self Help, Inc. v. Abyssinian Baptist Church of City of New York*, 189 F.R.D. 284, 286 (S.D.N.Y. 1999) (quoting *Gap, Inc. v. Stone Int'l Trading, Inc.*, 169 F.R.D. 584, 588 (S.D.N.Y.), *aff'd*, 125 F.3d 845 (2d Cir. 1997)).   Legal prejudice has been defined as the impairment of "some legal interest, some legal claim, [or] some legal argument." *Westlands Water Dist. v. United States*, 100 F.3d 94, 97 (9th Cir.1996) (identifying as examples of legal prejudice, such as loss of a federal forum, the loss of jury trial rights, the loss of a statute-of-limitations defense).

With respect to voluntary dismissal, the court primarily seeks to protect a defendant who is ready to pursue a claim or defense "*in the same action* that the plaintiff is seeking to have dismissed."[40]  *Camilli v. Grimes*, 436 F.3d 120, 124 (2d Cir. 2006) (emphasis in original).   "Legal

---

[40]   The Second Circuit has found that the mere prospect of starting an entirely new litigation, along with the attendant additional expense, does not translate to legal prejudice sufficient to deny a plaintiff's motion to voluntarily withdraw. *D'Alto v. Dahon California, Inc.*, 100 F.3d 281, 283 (2d Cir.1996).  However, a recognized exception to this rule occurs "when the cause has proceeded so far that the defendant is in a position to demand on the pleadings an opportunity to seek affirmative relief and he would be prejudiced by being remitted to a separate action." 100 F.3d at 283 (citation and internal quotations omitted). In other words, "[h]aving been put to the trouble of getting his counter case properly pleaded and ready, [the defendant]  may insist that the cause proceed to a decree." *Id.*

prejudice would occur, for example, if dismissal of the plaintiff's case also impairs the ability of a defendant to pursue a counterclaim in the same action that plaintiff seeks to dismiss." *Brown v. Nat'l R.R. Passenger Corp.*, 293 F.R.D. 128, 131 (E.D.N.Y. 2013) (citation omitted).

In *Zagano v. Fordham University*, the Second Circuit enunciated a list of factors relevant to the determination of whether a Rule 41(a)(2) motion should be granted. 900 F.2d at 14. The factors include: "(1) the plaintiff's diligence in bringing the motion [to dismiss]; (2) any 'undue vexatiousness' on plaintiff's part; (3) the extent to which the suit has progressed, including the defendant's effort and expense in preparation for trial; (4) the duplicative expense of relitigation; and (5) the adequacy of plaintiff's explanation for the need to dismiss." *Catanzano v. Wing*, 277 F.3d 99, 110 (2d Cir. 2001) (quoting *Zagano*, 900 F.2d at 14). *See also Brown v. Nat'l R.R. Passenger Corp.*, 293 F.R.D. 128, 131 (E.D.N.Y. 2013) (same).

In the case at bar, one or more of the *Zagano* factors militate against granting dismissal of the action. First, if the action is dismissed, there will likely be duplicative expense for the parties to relitigate this matter in federal or state court. As described *supra*, Rambler, having already been put to the trouble and expense of drafting and filing its counterclaims, would have to refile its claims in a new action. To defend itself, Speedboat would then respond by filing its current claims as counterclaims so that the litigation would recommence, creating additional expense. Second, and most importantly, Speedboat's sole stated basis to warrant dismissal is lack of subject matter jurisdiction and that argument is meritless in light of the Court's finding of admiralty jurisdiction. Therefore, even if Rambler were willing to pursue its counterclaims independently and with additional expense, the lack of merit in Speedboat's motion to dismiss militates against, rather than warrants, an order of dismissal.

**B.**    **Rambler's Motion to Amend/Correct Its Answer and Counterclaims**

Because this Court has admiralty jurisdiction and Speedboat's request for voluntary dismissal will be denied, Rambler's motion to amend or correct its answer and counterclaims must be resolved. In requesting leave to amend pursuant to Rule 15(a)(2), Fed. R. Civ. P., Rambler seeks to "(1) amend its allegations of jurisdiction, (2) add additional causes of action, and (3) clarify and add facts in its answer and its counterclaims."  Doc. 46, at 1.  In addition, under Federal Civil Rule 21, Rambler moves the Court to join Alexander E. Jackson as a defendant to Rambler's counterclaims.[41]

**1.**    **Rule 15(a)**

In general, a party may amend its pleading once as a matter of course within 21 days after serving it.[42]  Although this is Rambler's first motion to amend, the motion was filed approximately five months after service of its original pleading.  *See* Doc. 29 & 46.   Rambler's motion to amend is thus governed by Rule 15(a)(2), Fed. R. Civ. P., which provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave" and "[t]he court should freely give leave when justice so requires."  Speedboat has filed an objection to the amendment, asserting that the Court lacks subject matter jurisdiction.  On that  basis alone, Speedboat urges the

---

[41] Federal Civil Rule 21, captioned "Misjoinder and Nonjoinder of Parties" authorizes the court, "[o]n motion or on its own," to "at any time, on just terms, add or drop a party."

[42]  Rule 15(a), Fed. R. Civ. P., provides:

(1) *Amending as a Matter of Course.* A party may amend its pleading once as a matter of course within:

    (A) 21 days after serving it, or

    (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

Court to find that amendment would be futile.

Because this Court in fact has admiralty jurisdiction, it has discretion to decide whether to grant leave to amend. The Court must examine the proposed amendments, guided by the last sentence of Rule 15(a)(2), which instructs that justice be done.[43]

"In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962). *See also Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) ("Leave to file an amended complaint 'shall be freely given when justice so requires,' Fed. R. Civ. P. 15(a), and should not be denied unless there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility.").

Applying the *Foman* standard to the case at hand, there is no evidence that the proposed amendments are the product of any undue delay or bad faith. In particular, Rambler filed its motion to amend the pleadings and to join Jackson as a party within the deadlines of the current scheduling order. The motion is thus timely on its face. Furthermore, there is no evidence demonstrating that Rambler sought to delay the proceedings, only to enhance the pleadings and add all necessary parties.

In particular, Rambler represents that it has a good faith basis to amend its allegations of

---

[43] With respect to amendments other than those which may be made a matter of course, Rule 15(a)(2), Fed. R. Civ. P., provides:

> (2) *Other Amendments.* In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

jurisdiction to specify the presence of admiralty jurisdiction pursuant to 28 U.S.C. § 1653, which provides that "defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." *Id.* (citing *Johnson Prods. Co., Inc. v. M/V La Molinera*, 619 F.Supp. 764, 767 (S.D.N.Y. 1985) ("It is well settled that, pursuant to 28 U.S.C. § 1653, the court may allow amendments of the pleadings to cure defective allegations of jurisdiction.")).  In addition, Rambler asserts that it has a "good faith basis" to join Jackson as a party because he is "a party to the [Agreement] that forms the basis of many of Rambler's claims and because Jackson was intimately involved in the facts giving rise to this dispute."  Doc. 46, at 2.

Furthermore, the Court notes that because this case remains in its early stages, there is no evidence that there will be any undue prejudice to Speedboat in allowing the amendments to be made at this time.  In sum, unless there would be futility of amendment, which will be examined *infra*, Pt. II.B.3., justice will require that the Court freely grant leave to the proposed amendments.

## 2.    <u>Rules 19 & 20 - Required and Permissive Joinder of Parties</u>

With respect to the proposed addition of Jackson as a counterclaim defendant, although Rambler solely cites Federal Civil Rule 21 regarding misjoinder and nonjoinder of parties,  Rules 19 and 20  also address joinder.  Under Rule 19, a required party is one in whose absence "the court cannot accord complete relief among existing parties," or who "claims an interest relating to the subject of the action and is so situated that disposing of the action in [his or her] absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest."

Rule 20 directs "permissive joinder of parties," and provides in relevant part:

> Persons – as well as a vessel, cargo, or other property subject to admiralty process in rem – may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action."

Fed. R. Civ. P. 20.

It is unclear whether Rambler seeks to add Jackson as a "required" or "permissive" defendant; Rambler simply asserts that the failure to join him is a "misjoinder." In any event, given the fact that Jackson participated in and was a party to the Agreement at issue, he is at the very least a permissive, and more likely a required, defendant. As Rambler asserts, Jackson is "the principal of Speedboat and has been intimately involved in this dispute and the facts giving rise to this dispute." Doc. 46, at 3. He was a party to the Agreement at the very heart of this litigation. It is arguable that his absence from the action may impair the Court's ability to grant complete relief to the existing parties. Moreover, as Speedboat's principal, Jackson is likely already fully aware of the action so not subject to the prejudice of surprise of its existence. After all, he allegedly resides at 33 Gilliam Lane, Riverside, Connecticut, which is the same address as Speedboat's principal place of business. *See* Doc. 46, at 21 (¶ 3). Practically speaking, as the principal of Speedboat, Jackson is likely already participating in this action in all but name. Furthermore, his presence in this action would not deprive the Court of subject matter jurisdiction, which is based in admiralty.[44]

### 3.    Prospect of Futility under *Foman*

The Court will thus examine the remaining ground for denying amendment of the pleading: the prospect of futility with respect to the proposed amendments. As set forth *supra*, although leave

---

[44] According to Rambler, there is also personal jurisdiction over Jackson because he resides in the state of Connecticut. Doc. 46, at 53. In its objection to Rambler's motion to amend, Speedboat does not address or refute the presence of personal jurisdiction.

to amend must be freely given under ordinary circumstances, denial is proper where the proposed amendment would be "futile." *Foman*, 371 U.S. at 182.  An amendment is considered "futile" if the amended pleading fails to state a claim or would be subject to a successful motion to dismiss on some other basis. *See, e.g., Lucente v. Int'l Bus. Machs. Corp.,* 310 F.3d 243, 258 (2d Cir. 2002 ) ("An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).") (citing *Dougherty v. North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002)); *Donovan v. Am. Skandia Life Assur. Corp.*, 217 F.R.D. 325, 325 (S.D.N.Y. 2003) ("Where a proposed amended complaint cannot itself survive a motion to dismiss, leave to amend would be futile and may clearly be denied.") (citations omitted), *aff'd*, 96 F. App'x 779 (2d Cir. 2004); *see also Bentley v. Greensky Trade Credit, LLC*, No. 3:14-CV-1157 (VAB), 2015 WL 9581730, at *2 (D.Conn. Dec. 30, 2015) ("a Court may deny leave to amend if the proposed amendment would be futile because it fails to state a claim that would survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)), *reconsideration denied sub nom.*, *Bentley v. Tri-State of Branford, LLC*, No. 3:14-CV-1157 (VAB), 2016 WL 2626805 (D. Conn. May 6, 2016).[45]

Examining the proposed amendments for "futility,"  Rambler first seeks to supplement and clarify subject matter jurisdiction as "admiralty jurisdiction."  As set forth *supra*, such amendment is proper under  28 U.S.C. § 1653  and clearly not futile.  In the Answer portion of its pleading, Rambler also seeks to correct citation to the Agreement (Section 4.1(m) versus 4.1(h), at ¶ 13). Throughout the pleading, Rambler inserts Jackson's name as a party, including in the factual

---

[45] For example, a proposed amendment would be futile if it failed to state a claim, destroyed the Court's subject matter jurisdiction, or asserted claims which are time-barred by the relevant statutes of limitation.

allegations (*e.g.*, Answer, ¶¶ 19, 23, Parties, ¶ 3),  and provides additional background facts regarding the manufacture of the Yacht's keel, which eventually cracked, giving rise to this litigation.

### a.   Counts I-IV:  Breach of Contract

As to Rambler's proposed counterclaims, the first four allege breach of contract.  Under Connecticut law, the state law chosen by the parties (in instances where federal maritime law does not control), "[t]he elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages."[46] *Keller v. Beckenstein*, 117 Conn. App. 550, 558  (2009) (quoting *American Express Centurion Bank v. Head*, 115 Conn.App. 10, 15-16 (2009)).  Each of these four claims includes the mandatory elements for a contract claim, alleging that the parties entered the Agreement, Rambler performed its duties under the Agreement while attempting to race the Yacht in the Atlantic Ocean Racing Series; breach by Speedboat and Jackson (by depriving Rambler of exclusive use of the Yacht after late August 2011 (Count I, ¶ 48), by failing to deliver the Yacht in "ship shape, sailable racing condition" (Count II, ¶ 52), "by failing to provide Rambler with photographs of the crack found during the manufacturing of the keel and the repair to the crack attempted by Eligi Re Fraschini Spa and/or Re Fraschini

---

[46]  The Court notes that Connecticut's statute of limitations for a breach of contract action is "six years after the right of action accrues," Conn. Gen. Stat. § 52-576(a).  Therefore, Rambler's contract counterclaims, including breach of the implied covenant of good faith and fair dealing and implied warranty of seaworthiness, filed in 2013, fall well within the six-year period following the contract's alleged breach in 2011.  In addition, Rambler's negligent misrepresentation and CUTPA claims fall within the mandatory respective statutes of limitation.  *See* Conn. Gen. Stat. § 52-577 (creating 3-year statute of limitations for "action founded upon a tort"); *In re Colonial Ltd. Partnership Litigation*, 854 F.Supp. 64, 90 (D.Conn.1994) ("All common law tort claims, including claims for fraud, negligent misrepresentation, and breach of fiduciary duty, are subject to a three-year statute of limitations, which runs from the date of 'the act or omission complained of.'") (citing and quoting Conn. Gen. Stat. § 52-577); Conn. Gen. Stat.  § 42-110g(f) (imposing 3-year statute of limitations for CUTPA claim).  The contract containing the alleged misrepresentations was formed within 3 years before these claims were filed in 2013.

Components" (Count III, ¶ 56), by "fail[ing] to disclose that the keel fin had been manufactured with a limited expected life of as short as one to two years and that simply hitting obstructions at speeds as low as six knots could introduce cracks into the keel fin," and by "fail[ing] to disclose one or more additional cracks in the Yacht's keel fin that developed after the crack discovered on or about March 17, 2008 and the defective and improper repair work on the keel fin that took place after the repair by Eligi Re Fraschini Spa and/or Re Fraschini Components prior to March 28, 2008"   (Count IV, ¶¶ 62-63)); and damages in millions of dollars in operating expenses, repair and maintenance costs, racing fees, crew and employee salaries and benefits, and other ancillary costs in connection with the Yacht.

Because they contain the requisite elements for a *prima facie* contract claim, these four proposed contract claims, set out in Rambler's amended Counterclaims I-IV, may proceed as facially plausible claims.[47]  Their amendment is not futile.[48]

The remaining proposed amended counterclaims are breach of the implied warranty of seaworthiness (against Speedboat) (Count V), breach of the covenant of good faith and fair dealing (against Jackson and Speedboat) (Count VI), negligent misrepresentation (against Jackson and Speedboat) (Count VII), and violation of the Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. §§ 42-110a, *et seq.*) (against Speedboat) (Count VIII).  The Court will examine these claims

---

[47]  In describing claims as "facially plausible" in this Omnibus Ruling, the Court employs the United States Supreme Court's seminal "plausibility" standard set forth  in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Under *Iqbal*, "[t]o survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[48]   In permitting these claims to proceed, the Court voices no opinion as to the merits or truth of the factual allegations contained therein.  Rather, the Court leaves Rambler to its proof on these pending claims.

to see whether their amendment would be futile – *i.e.*, whether, as drafted, these claims are capable of withstanding a motion to dismiss for failure to state a valid claim.

### b.    Count V: Breach of the Implied Warranty of Seaworthiness

As to Count V, under federal maritime law, "[t]he general rule is that a warranty of seaworthiness attaches to every charter." *McAllister Lighterage Line v. Ins. Co.,* 244 F.2d 867, 871 (2d Cir. 1957).[49]  Under such a warranty, the shipowner must "furnish a vessel and appurtenances reasonably fit for their intended use." *Morales v. City of Galveston, Tex.*, 370 U.S. 165, 169 (1962) (citation and internal quotation marks omitted).  *See also  Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960) (same).[50] More specifically,  all "things about a ship, whether the hull, the decks, the machinery, the tools furnished, the stowage, or the cargo containers, must be reasonably fit for the purpose for which they are to be used."[51] *Gutierrez v. Waterman S.S. Corp.*, 373 U.S. 206, 213 (1963).

The warranty of seaworthiness is absolute so that the shipowner's liability does not depend on a finding of negligence or a lack of due diligence.  *Mitchell*, 362 U.S. at 549.  Moreover, when the charter delineates a set term of time, "the warranty generally extends through[out] the entire

---

[49]  In *McAllister Lighterage Line v. Ins. Co.*, 244 F.2d 867, 871 (2d Cir. 1957), the Second Circuit clarified that "parties to a contract of private carriage are free to bargain as they please, and the warranty [of seaworthiness] will not be implied where it is waived."

[50]  As Justice Stewart explained in *Mitchell*, "[t]he duty [to furnish a seaworthy vessel] is absolute," but "[t]he standand is not perfection."  362 U.S. at 550.  There must be "reasonable fitness[:] not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service."  *Id.*

[51]  As defined by the Second Circuit, "[s]eaworthiness is the ability of a vessel adequately to perform the particular services required of her on the voyage she undertakes." *McAllister Lighterage Line v. Ins. Co.*, 244 F.2d 867, 870 (2d Cir. 1957) (citing, *inter alia*, *The Silvia*, 1898, 171 U.S. 462, 464 (1898)).

41

charter term." *JJ Water Works, Inc. v. San Juan Towing & Marine Servs., Inc.,* 59 F. Supp. 3d 380, 395 (D.P.R. 2014). *See also Matter of P & E Boat Rentals, Inc*., 872 F.2d 642, 647 (5th Cir. 1989) ("a time charterer who has no control over the vessel, assumes no liability for . . . unseaworthiness of the vessel absent a showing that the parties to the charter intended otherwise.") (citation and internal quotation marks omitted). *See also generally*  2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 11-5 (5th ed. 2013).

In the case at bar, Rambler alleges that the implied warranty of seaworthiness was violated by Speedboat because Speedboat was obligated to provide Rambler with the exclusive use of the Yacht for a set term for the purpose of racing in the Atlantic Ocean Racing Series, so that "seaworthiness was necessary and inherent to Speedboat's performance of its obligations under the contract." Doc. 46, at 30-31  (¶¶ 67-68).  Speedboat  thus allegedly breached the implied warranty of seaworthiness in the Agreement by "providing the Yacht in a defective condition that was unfit for the agreed intended use of the Yacht." *Id.*, at 31 (¶ 69).  In particular, "the Yacht's keel fin was in a defective condition because it contained multiple cracks and at least one defective repair, had been defectively manufactured using poor quality and defective welds, had been manufactured with a limited expected life of as short as one to two years, and was unusually fragile." *Id.*  Under these circumstances, Speedboat has pled a plausible claim for breach of the implied covenant of seaworthiness.

### c.    Breach of the Covenant of Good Faith and Fair Dealing

With respect to Count VI, breach of the implied covenant of good faith and fair dealing (against Jackson and Speedboat), under Connecticut state law, "[i]t is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship." *De*

*La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 432 (2004).  Specifically, "every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement."  269 Conn. at 432 (citation and internal quotation marks omitted).  The covenant, therefore, "presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term."  *Id.* at 433 ( quoting *Celentano v. Oaks Condo. Ass'n*, 265 Conn. 579, 617 (2003)).

In order to constitute a breach of the implied covenant of good faith and fair dealing, the defendant's acts which deprive the plaintiff of its right to receive the benefits reasonably expected under the contract "must have been taken in bad faith."  *Keller v. Beckenstein*, 117 Conn. App. 550, 563 (2009) (citing *Landry v. Spitz*, 102 Conn.App. 34, 42 (2007)) .

In the instant case, Rambler's proposed Count VI alleges actions by Jackson and Speedboat which were taken in bad faith and deprived Rambler of its intended purpose of racing the Yacht in the 2011 Atlantic Ocean Racing Series.  Specifically, Rambler alleged that Jackson and Speedboat breached the implied covenant of good faith and fair dealing because: (1)  "they knew of but failed to disclose the crack in the keel fin that was discovered on or about March 17, 2008;" (2) "knew of but failed to disclose the repair to the crack by Eligi Re Fraschini Spa and/or Re Fraschini" between March 17 and 28, 2008; (3) "knew but failed to disclose that the keel fin had been manufactured with a limited expected life of as short as one to two years and that simply hitting obstructions at speeds as low as six knots could introduce cracks into the keel fin;" (4) "knew of but failed to disclose one or more additional cracks in the Yacht's keel fin that developed after the crack discovered on or about March 17, 2008 and the defective and improper repair work on the keel fin that took place

after the repair by Eligi Re Fraschini Spa and/or Re Fraschini Components prior to March 28, 2008;" and (5) "refus[ed] to allow Rambler to repair the Yacht so that Rambler could continue racing the Yacht through the end of the term of the Agreement."  Doc. 46, at 31-32 (¶¶ 72-76).  Each of these alleged actions created "conditions, flaws, damages, or defects that rendered or caused, or would render or cause, the Yacht not to be in ship shape, sailable  racing condition." *Id.*, at 31-32 (¶¶ 72-75).[52]  Moreover, Jackson's and Speedboat's refusal to allow Rambler to make repairs allegedly "destroy[ed] the right of Rambler to receive the benefits of the Agreement," thereby "evading the spirit of the Agreement."  *Id.*, at 32 (¶ 76).

As a result of Jackson's and Speedboat's alleged actions in breach of the implied covenant of good faith and fair dealing, Rambler "incurred millions of dollars in operating expenses, repair, and maintenance costs, racing fees, crew and employee salaries and benefits, and other ancillary costs in connection with the Yacht," "sustained damages by having to pay these and other costs and expenses," and "was denied the benefit of its bargain by not being able . . . to complete the racing program contemplated by the Agreement."  *Id.*, at 32-33 (¶ 77).

Upon review of these allegations, the Court finds that Count VI states a facially plausible claim for breach of the implied covenant of good faith and fair dealing.  Under the Agreement, Rambler was expressly granted the use of the Yacht to sail in the races of the 2011 Atlantic Ocean Racing Series.  Moreover,  the Yacht was intended to be in "ship shape, sailable racing condition" upon delivery to Rambler so that the Yacht could compete in those races. Doc. 10-3, at 5 (§ 4.1(c)).

---

[52]   A crack in a keel may, to a lay observer,  appear a relatively small defect on a 30-meter vessel, but such a crack allegedly led to the capsize of the majestic Yacht.  In the words of Benjamin Franklin, "Beware of little expenses.  A small leak will sink a great ship."  And allegedly, a small crack may, in the right circumstances, do so as well.

Each of the alleged violations of the implied breach are actions which Jackson and Speedboat knew or should have known would render the Yacht unsailable, and thus unfit for its intended purpose. Consequently, Rambler allegedly incurred millions of dollars in costs and expenses while being denied the benefit the bargain, namely the opportunity to compete in the racing series contemplated in the Agreement. Under these circumstances, Rambler has set forth a plausible claim for breach of the implied covenant of good faith and fair dealing.

### d.      Count VII: Negligent Misrepresentation

Next, Rambler's proposed Count VII attempts to state a claim for negligent misrepresentation against Jackson and Speedboat. In Connecticut, the "governing principles" of this tort are "set forth in similar terms in  in § 552 of the Restatement Second of Torts (1977): One who, in the course of business, profession, or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their *justifiable reliance* upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." Restatement (Second) of Torts § 552 (1977) (emphasis in original; internal quotation marks omitted). *See also Savings Bank of Manchester v. Ralion Fin. Servs., Inc.*, 91 Conn. App. 386, 389-90 (2005). Put simply, "an action for negligent misrepresentation requires the plaintiff to establish (1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." *Nazami v. Patrons Mutual Ins. Co.*, 280 Conn. 619, 626, 910 A.2d 209 (2006).  "Even an innocent misrepresentation can give rise to liability if the speaker reasonably should have known the truth."  *Nat'l Groups, LLC v. Nardi*, 145 Conn. App. 189, 193 (2013) (citing *Glazer v. Dress Barn, Inc.*, 274 Conn. 33, 72–73 (2005)).

In order for the plaintiff to prevail on a negligent misrepresentation claim, the plaintiff must prove *reasonable reliance* on the defendant's misrepresentation. *Visconti v. Pepper Partners Ltd. Partnership*, 77 Conn.App. 675, 682 (2003). Reliance on a particular statement may become reasonable based on the statement's context, formal nature, the relationship between the parties, or the communicator's status as an individual with specialized knowledge. *Nat'l Groups, LLC*, 145 Conn. App. at 194 (citations omitted). Reasonableness is a question of fact and typically "determine[d] based on all of the circumstances." *Williams Ford, Inc. v. Hartford Courant Co.*, 232 Conn. 559, 580 (1995). Therefore, "[r]eliance on a contractual term or a writing is not automatically reasonable – a court still must give due consideration to the surrounding circumstances." *Nat'l Groups, LLC*, 145 Conn. App. at 194 (citing *Savings Bank of Manchester*, 91 Conn.App. at 391-92 and *Petitte v. DSL.net, Inc.*, 102 Conn.App. 363, 373 (2007)). "The plaintiff's knowledge is particularly relevant to determining whether, under all the circumstances, reliance was reasonable." *Nat'l Groups, LLC*, 145 Conn. App. at 194 (citing *Gibson v. Capano*, 241 Conn. 725, 733–34 (1997))

In the case at bar, in Count VII Rambler alleges that Jackson and Speedboat made representations to Rambler that they knew or should have known were false. Doc. 46, at 33 (¶ 80). Included in these alleged misrepresentations were "representations that the Yacht was in ship shape, sailable racing condition, and free of material defects." *Id.*, at 33 (¶ 79). Also, Jackson and Speedboat allegedly failed to "disclose material facts" such as "the defective condition of the Yacht's keel fin, cracks in the Yacht's keel fin, defective and improper repair work on the keel fin," the manufacture of the keel fin with "a limited expected life span of as short as one to two years," and "the keel fin was unusually fragile." *Id.*, at 33 (¶ 81). According to Rambler, each of Jackson's and

Speedboat's alleged false representations and/or failure to disclose material facts occurred "in order to induce Rambler to enter into the Agreement." *Id.*, at 33 (¶ 82). Each such alleged action or omission resulted in Rambler sustaining damages in "costs and expenses" while it was "denied the benefit of its bargain" – *i.e.*, prevented from competing in the racing program contemplated by the Agreement. *Id.*, at 33 (¶ 84).

Examining all of the circumstances alleged, Rambler has pled sufficient facts to state a facially plausible claim for negligent misrepresentation. The terms of the Agreement specifically stated that the Yacht was to be delivered in ship shape, sailable racing condition. It was reasonable for Rambler to believe that Jackson and/or Speedboat, as the Yacht's owners, possessed sufficient information regarding the condition of the Yacht to assess its condition. Furthermore, it was clear in the Agreement that Rambler's intended use of the Yacht was to compete in a series of sailing races. Rambler's allegations thus suggest it justifiably relied on Jackson's and Speedboat's statements regarding the seaworthiness of the Yacht while contracting for the benefit of the bargain – participation in the racing series. When the Yacht turned out to be defective (possessing cracks in its keel fin), Rambler incurred pecuniary losses (costs and expenses) and lost the opportunity to complete the series of races. Due to its justifiable reliance on Jackson's and Speedboat's representations that the Yacht was in ship shape, sailable racing condition, Rambler was allegedly denied the benefit of the bargain, resulting in damages.

  **e.  Count VIII:  Violation of the Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. §§ 42-110a, *et seq.*)**

Finally, in Count VIII, Rambler alleges that Speedboat's actions in forming the Agreement "as part of its business" violated Connecticut's Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, *et. seq.* That statute provides that "[n]o person shall engage in unfair methods of

competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b. Moreover, "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42–110b" may bring a civil action based on CUTPA. Conn. Gen. Stat. § 42–110g.

The Connecticut Supreme Court has adopted the "cigarette rule by the federal trade commission for determining when a practice is unfair" under CUTPA: "(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise – in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]." *Ventres v. Goodspeed Airport, LLC*, 275 Conn. 105, 155 (2005) (citation omitted). *See also Garcia v. Fry*, No. 3:15-CV-597(AWT), 2016 WL 2944517, at *4 (D. Conn. May 12, 2016). All three criteria need not be satisfied to support a finding of unfairness. *Ventres*, 275 Conn. at 155. Moreover, a practice may be unfair due to the degree to which it meets a particular criterion or if it meets all three criteria to a lesser degree. *Id.*

In the case at bar, Rambler alleges that Speedboat's conduct in failing to disclose material facts of the defective condition of the Yacht's keel fin – *i.e.*, its unsailable ("unfit") condition for racing – was "unfair and deceptive," and "unscrupulous, unethical, and immoral." Doc. 46, at 34 (¶¶ 86, 88-90, 92). Moreover, such conduct was "part of [Speedboat's] business," in formulating the Agreement. *Id.*, at 34 (¶ 87).

As to damages, Speedboat's conduct not only allegedly "put lives at risk," resulting in a

catastrophic capsize; such conduct also caused Rambler to sustain the ascertainable loss of "millions of dollars in operating expenses, repair, and maintenance costs, racing fees, crew and employee salaries and benefits, and other ancillary costs in connection with the Yacht." *Id.*, at 34 (¶¶ 91, 93).

The allegations of Count VIII thus include assertions that Speedboat engaged in unfair, deceptive behavior in business, failing to disclose key material facts regarding defects in the Yacht's keel fin, while forming the Agreement with Rambler. *Id.*, at 34 (¶¶ 86-89).   In light of Rambler's stated purpose to sail the Yacht in the Atlantic Ocean Racing Series, Speedboat's failure to disclose these defects was "unscrupulous, unethical, and immoral." *Id.* (¶ 92).   Furthermore, the alleged failure to disclose offended public policy, risking the lives of others, and resulted in the ascertainable loss of millions of dollars.  *Id.*, at 34 (¶¶ 91, 93).   In total, Rambler's allegations in Count VIII describe business conduct which (1) offends public  policy under common law (*e.g.*, misrepresentation, breach of contract) and/or under established notions of unfairness; (2) was "immoral, unethical, [and] unscrupulous;" [and]  (3) caused substantial injury (loss of millions of dollars) to Rambler, a business entity.   These allegations thus state a plausible claim for violation of CUTPA by Speedboat.

In sum, after careful review, the Court finds that Rambler's proposed amendments to its answer and counterclaims would not result in futility under *Foman*.  These claims possess facial plausibility under *Iqbal* and accordingly would not be subject to dismissal.   Rambler will thus be granted leave to amend its pleading as requested.

## C.   Speedboat's  Motion to Stay Discovery [Doc. 52] and Rambler's Motion to Compel [Doc. 57]

"In the interest of saving the time, expense and burden of discovery," Speedboat filed a motion to  request "that discovery be stayed until the Court rules on Speedboat's pending Motion to

Dismiss for lack of subject matter jurisdiction." Doc. 53 (Speedboat's brief in support of motion to stay discovery), at 4. The Court has found that it has admiralty jurisdiction so will deny the Motion to Dismiss [Doc. 44] in this Ruling. Accordingly, Speedboat's "Motion to Stay Discovery" [Doc. 52] will be denied as moot.

With respect to the status of discovery, Rambler filed a "Motion to Compel" [Doc. 57]. In that motion, Rambler requested that Speedboat turn over additional documents with respect to Rambler's document requests, served on Speedboat on January 17, 2013, and Rambler's second set of four interrogatories, served on May 30, 2013. At the time Rambler filed the motion, Speedboat had only returned 35 pages of documents, compared to 4,500 pages of documents Rambler had produced to Speedboat in response to its document requests.

Based on the parties' briefs, Speedboat's asserted justification for failing to turn over additional documents to Rambler was reliance upon its motion to dismiss. In particular, Speedboat challenged the Court's subject matter jurisdiction. *See, e.g.*, Doc. 57-1 (Rambler's brief in support of Motion to Compel), at 7 (Speedboat "continued to refuse to produce any more documents and to answer interrogatories on the basis that this Court had no jurisdiction"); Doc. 58 (Speedboat's brief in opposition to motion to compel), at 7 (suggesting "that discovery should be stayed pending resolution of the jurisdictional issue"), *id.*, at 10 (asserting that "continuing discovery would be futile and wasteful since the Court lacks subject-matter jurisdiction over the parties' claims").

Given the passage of time since the discovery dispute arose and the Court's current finding that it has admiralty jurisdiction, Rambler's motion to compel will be denied without prejudice to renewal. Speedboat can no longer rely on its jurisdictional argument and must, if it has not already done so, produce relevant, responsive, and non-privileged documents to Rambler. Should

50

Speedboat fail to respond, Rambler may renew its motion to compel, if so advised.

### III. <u>CONCLUSION</u>

For purposes of clarity, pursuant to Federal Civil Rule 41(a)(2), the Court hereby APPROVES the joint "Stipulation of Discontinuance" [Doc. 43] filed by Federal and Speedboat on June 7, 2013, with respect to Federal's claims against Speedboat.  That dismissal  was "proper" in that it  resolved Federal's claims in this action, Speedboat expressly approved the stipulation, Rambler made no objection to the stipulation, and Speedboat and Rambler continued litigating their claims against each other without asserting any prejudice by Federal's "discontinuance" in the action. Accordingly, as stated in the stipulation,  Federal's "action against the defendant Speedboat Racing Ltd[.] is hereby discontinued with prejudice and without cost to either party."  Doc. 43, at 1.

With respect to Speedboat's "Motion to Dismiss" [Doc. 44], asserting lack of subject matter jurisdiction, that motion is DENIED.  The Court possesses admiralty jurisdiction over the pending claims relating to the Agreement pursuant to  28 U.S.C. § 1333. The primary objective of the Agreement was to create a lease or charter for Rambler's use of the Yacht in the 2011 Atlantic Ocean Racing Series. The charter provisions create a maritime contract, which is related to the navigation, business or commerce of the sea.

Moreover, the maritime provisions are separable from the incidental, non-maritime sale of one share of ownership in Speedboat to Rambler. That "sale" was ancillary to the grant of use or charter of the Yacht and severable.  Rambler's ownership was also severely undercut, circumscribed, and  diminished by the many provisions under which Speedboat and Jackson retained control of the Yacht and regained full ownership upon termination. In essence, this was an agreement for Rambler to utilize its sailing expertise to race  Speedboat's Yacht to glorious victory.   After this charter, the

Yacht would then be returned to Speedboat.

Employing either the Second Circuit's "conceptual" approach, focusing on the primary objective, or its "severability" test, the Court possesses admiralty jurisdiction over the pending claims and counterclaims which relate to the Agreement, its formation, and breach.

The two non-contract counterclaims by Rambler, a tort action for negligent misrepresentation and a Connecticut state statutory claim under CUTPA, arise out of the same nucleus of operative facts, and thus form part of the same case or controversy, as the contract claims. In particular, they address Speedboat's conduct in negotiating and forming the Agreement. The Court possesses supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367.

Rambler's "Motion to Amend or Correct" [Doc. 46] its answer and counterclaims, including the request for leave to add Alexander E. Jackson as a party, is GRANTED pursuant to Federal Civil Rules 15(a)(2) and 19-21, respectively. As to the proposed amendments in general, there is no evidence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment" so that the leave sought shall be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962). Moreover, the addition of Jackson as a party is permissible, if not required, in light of his participation as a party to the Agreement at issue.

Rambler must file and serve its proposed "Second Amended Answer and Counterclaims" on or before **August 26, 2016**, and effect proper service in accordance with the Federal and Local Rules of Civil Procedure. *See* Fed. R. Civ. P. 4, 5; D. Conn. L. Civ. R. 4, 5. Within 21 days after service, Speedboat and Jackson must serve their answers or responses to the amended counterclaims.

Fed. R. Civ. P. 12 (a)(1)(A)(i).

In light of the Court's finding of admiralty jurisdiction, Speedboat's "Motion to Stay Discovery" [Doc. 52] is DENIED as moot.  In addition, given the passage of time since the discovery dispute arose and the Court's current finding of admiralty jurisdiction, Rambler's "Motion to Compel Discovery" [Doc. 57] is DENIED WITHOUT PREJUDICE.  Speedboat must respond to Rambler's discovery requests on or before **August 26, 2016,** failing which Rambler may renew its motion to compel.  In addition, the parties are directed to file a joint status report with the Court, proposing revised dates for the remaining case deadlines, on or before **September 16, 2016.**

Finally, the Court takes judicial notice that the media has reported that the Yacht has been reborn and relaunched as "Perpetual Loyal" and resumed racing. *See, e.g.,* http://www.sailingscuttlebutt.com/2016/01/04/48454/; www.facebook.com/perpetual.loyal; and http://www.rolexsydneyhobart.com/the-yachts 2015/perpetual-loyal/.   If this rebirth has indeed occurred, the parties may be inclined to expedite resolution of this matter. To that aim, the parties are reminded that, if so advised, they may once again jointly request referral to a magistrate judge for a settlement conference.

All of the foregoing is  SO ORDERED.

Dated: New Haven, Connecticut
        August 9, 2016

                                        */s/Charles S. Haight, Jr.*
                                        CHARLES S. HAIGHT, JR.
                                        Senior United States District Judge